# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE

**FOR PUBLICATION**

**Filed:** _____ June 15, 1998 _____

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| APPELLEE, | ) | CHEATHAM CIRCUIT |
| | ) | |
| v. | ) | Hon. Allen W. Wallace, Judge |
| | ) | |
| JAMES BLANTON, | ) | No. 01S01-9605-CC-00093 |
| | ) | |
| APPELLANT. | ) | |

**FILED**

June 15, 1998

**Cecil W. Crowson**
**Appellate Court Clerk**

FOR APPELLANT:

Michael E. Terry
Nashville

Mark Ivandick
Clarksville

FOR APPELLEE:

John Knox Walkup
Attorney General and Reporter

Michael E. Moore
Solicitor General

Kathy Morante
Deputy Attorney General

Darian B. Taylor
Assistant Attorney General
Nashville

Dan M. Alsobrooks
District Attorney General

J. Kenneth Atkins
Assistant District Attorney General
        Pro Tem

James W. Kirby
Assistant District Attorney General
Charlotte

# O P I N I O N

COURT OF CRIMINAL APPEALS AFFIRMED                    HOLDER, J.

In this capital case, the defendant, James Blanton, was convicted by a jury of two counts of first degree premeditated murder, four counts of grand larceny, and three counts of first degree burglary. A jury sentenced him to death on both counts of first degree murder based on three aggravating circumstances: (1) the defendant was convicted of one or more previous violent felonies; (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; (3) the murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb. Tenn. Code Ann. § 39-2-203(i)(2), (6) & (7) (1982). In addition to the above aggravating circumstances, the jury found that Mrs. Vester's murder was especially heinous, atrocious and cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5). The jury found that no mitigating circumstances sufficiently outweighed the aggravating circumstances.

On direct appeal to the Tennessee Court of Criminal Appeals, the defendant challenged both his convictions and his sentences. The appellate court found that two of the grand larceny convictions should have been merged. The appellate court, however, affirmed both the defendant's remaining convictions and his sentences.

The defendant has appealed to this Court raising numerous issues. We have thoroughly reviewed those issues addressed by the parties' briefs. We have carefully examined the law, the record and the thorough opinion of the

2

Court of Criminal Appeals. We have found that all of the defendant's issues are devoid of merit and that the evidence amply supports the jury's findings as to aggravating and mitigating circumstances. The sentence of death was neither imposed arbitrarily nor was the sentence disproportionate to sentences imposed in similar cases. Accordingly, the judgment of the Court of Criminal Appeals upholding the defendant's convictions and sentencing him to death by electrocution is affirmed.

## FACTUAL BACKGROUND

In the early morning hours of June 16, 1988, eight men successfully escaped from the Kentucky State Penitentiary at Eddyville, Kentucky. The eight escaped convicts were identified as the defendant, Derrick Quintero, William Hall, Joseph Montgomery, Ronnie Hudson, Bobby Sherman, Leo Sperling and Floyd Cook. Sherman was apprehended on June 17, 1988. Sperling and Cook were apprehended on June 18, 1988. Montgomery and Hudson were seen in Lebanon, Kentucky, on June 19, 1988, and captured in Kentucky on June 22, 1988. Hall was captured in July of 1988. The defendant and Quintero were captured shortly after Hall's apprehension.

A 1966 Chevrolet truck owned by Curtis Rogers was stolen in Eddyville, Kentucky, on the day of the convicts' escape. A number of the escapees apparently stole the truck to facilitate their escape. The truck was later located in a wooded area of Stewart County, Tennessee. Two paperweights with Cumberland Electric logos and several knives were found in or around the truck. The owner of the truck testified that he had never seen the paperweights before. The paperweights were later identified as items taken from the Cherry residence, located near the murder scene.

3

Stewart County, Tennessee, is located in close proximity to the Tennessee-Kentucky border. A rash of burglaries in the Leatherwood Resort area of Stewart County began to occur following the convicts' escape from the penitentiary in Eddyville, Kentucky. The burglarized residences were owned by Jim McMinn, Essie Settles, Alfred Cherry, Thomas Harris, Neal Foster, and John and Virginia Crawford. These homes were either summer cabins or permanent residences.

On Saturday, June 18, 1988, Jim McMinn of Clarksville, Tennessee, visited his cabin in the Leatherwood area. He arrived at his cabin at approximately noon. He went fishing in his boat at approximately 1:00 p.m. and returned around 3:00 p.m. Upon returning, he noticed that two boxes of 20 gauge shotgun shells were lying on the floor of his cabin. He went to the bedroom where he discovered that his loaded .22 revolver was missing. The telephone in his cabin had been removed from the wall, and the outside portion of the phone line had been severed. Mr. McMinn attempted to start his truck but discovered that the ignition had been destroyed. Both his telephone and an axe were lying in the bed of his disabled truck. Mr. McMinn walked to a neighbor's house and called the sheriff's department.

The Stewart County Sheriff's Department had received several reports of suspicious individuals in the Leatherwood area. The department became concerned that the escaped convicts were in the area. The department, therefore, conducted a search of the Leatherwood community. The search lasted from approximately 11:00 p.m. on Saturday, June 18, until 3:00 p.m. on June 19. The department was unsuccessful in locating any of the escaped inmates.

4

On Sunday, June 19, at approximately 1:30 p.m., Essie Settles discovered that her 1982 Ford Fairmont and some tools were missing from her garage in Dover, Tennessee. The car was located approximately one week later in Kentucky. Authorities found a hammer, two crowbars, steel cutters, a hacksaw, a punch, two screwdrivers, and a chisel inside Ms. Settles' stolen automobile. A chain saw that was missing from Ms. Settles' garage, however, was not recovered.

On Wednesday, June 22, Kentucky authorities apprehended both Hudson and Montgomery near the location where the authorities found Ms. Settles' car . The convicts exchanged fire with the authorities prior to the convicts' apprehension. Hudson and Montgomery had in their possession Mr. McMinn's .22 caliber pistol and Neal Foster's .22 caliber pistol.

Hudson's brother testified that Hudson and Montgomery were waiting for him at his apartment in Lebanon, Kentucky, on Sunday, June 19, 1988. He stated that the two men were in a white car with Tennessee plates. He stated that he and Robert Payne accompanied Hudson and Montgomery to a riverbank where the convicts hid the car. Judy Hudson also visited with Hudson and Montgomery at the riverbank. The following morning, the two escaped convicts followed Ms. Hudson to her home in Campbellsville, Kentucky. They stayed with Ms. Hudson until the evening when she escorted the convicts to Martha Grover's apartment. The convicts stayed with Ms. Grover until early Tuesday morning. The witnesses testified that they never saw the defendant with Hudson or Montgomery.

On June 19, 1988, the Stewart County Sheriff's Department received two additional reports of burglaries in the Leatherwood community. Mr. Alfred Cherry's trailer had been burglarized. Mr. Cherry testified that his trailer was

5

approximately three-tenths of a mile from the murder victims' residence. On Sunday, June 19, Mr. Cherry and several family members visited the trailer and discovered that the back door had been removed. The inside of the trailer was in disarray. The bed was unmade, and wet towels were in the shower. The refrigerator light switch had been taped down to prohibit the light from operating when the refrigerator door was opened. Mr. Cherry also discovered that the trailer next door had been burglarized.

Mr. Cherry testified that two bedspreads, a green blanket, a sleeping bag, a portable radio/tape player, fifteen cassette tapes, a rechargeable flashlight, a small handsaw, five or six knives, coffee mugs, various canned goods, alcohol, a toothbrush, underwear and paperweights with the Cumberland Electric logo were missing. Mr. Cherry positively identified the paperweights found in the 1966 Chevrolet truck owned by Mr. Rogers. Mr. Cherry also positively identified two knives found at the Foster residence and stated that a third knife found outside of the Foster's residence was identical to a knife taken from his trailer. The value of the property taken from the Cherry's trailer was estimated at $ 600.00 to $ 700.00.

Thomas Harris owned the trailer located next to Mr. Cherry's trailer. He stated that the back door of his trailer had been pried off and that his trailer was ransacked. The refrigerator light had been removed, and the sink was full of dirty dishes. There was food still in a skillet on the stove. He testified that wet towels and sheets were strewn about, and cigarette burns were all over the floors. All of his canned food items, quilts, blankets, silverware, butcher knives, and a fishing tackle box had been taken. The value of the property taken from Mr. Thomas' trailer was estimated at $ 400.00 to $ 500.00.

Mr. Harris also testified that several unauthorized long distance telephone calls were placed from his trailer. Three of the unauthorized calls had been placed to a number in Springtown, Texas. These calls occurred on Sunday, June 19, at 3:51 a.m., 8:55 a.m. and 9:19 a.m. Two additional unauthorized calls were placed to a telephone number in Hopewell, Pennsylvania, at 4:00 a.m. and 9:19 a.m. The telephone number called in Springtown, Texas, was listed to a Bryan Quintero. The telephone number called in Hopewell, Pennsylvania, was listed to a Barbara Vasser. Ms. Vasser was William Hall's girlfriend at the time the calls were placed.

On Monday evening, June 20, John Corlew and Arthur Jenkins arrived at the Leatherwood boat dock. They launched their boat and night-fished in the Leatherwood Bay. They testified that between 11:30 p.m. and 1:00 a.m. they heard shots that appeared to emanate from the direction of the murder victims' residence. Mr. Corlew testified that he first heard two shots that were fairly clear. Then a pause ensued before he heard two additional shots followed by another pause and one last shot. Mr. Corlew testified that the first two shots sounded like repercussions from a pistol or a high-powered rifle. Mr. Jenkins remembered hearing only four shots.

Corlew and Jenkins returned to the boat dock around midnight to rest. At approximately 12:00 or 12:15 a.m., Mr. Jenkins saw a red GMC or Chevrolet pick-up truck drive to the boat dock. A man exited the truck and reached for the gas pump which appeared to be locked. The man then walked across the front of the restaurant and went around the corner for approximately five or six seconds. The man returned to his truck and left. Mr. Jenkins testified that later a 1977 or 1978 Pontiac pulled into the dock area, circled around and drove away. Mr. Corlew contacted the Stewart County Sheriff's Department when he learned of the murders.

7

On Tuesday, June 21, Neal Foster discovered that his house had been burglarized.  Mr. Foster left his home on June 16 and did not return until around 8:30 a.m. on Tuesday, June 21.  When Mr. Foster opened his garage door, he could see that the door into the house was open.  He immediately left and went to a neighbor's house to call the sheriff's department.

Mr. Foster testified that the inside of his house had been ransacked.  He stated that food was on a kitchen counter, two deer steaks were in the microwave, and his binoculars were sitting on a kitchen counter.  He stated that a green ammunition box, a plastic bag full of old coins, a flashlight, and the holster for his .22 caliber RG pistol were on the floor of the living room.  He further stated that the hallway floor was littered with a Diet Pepsi can inside two other tin cans, a tin can of old coins, a notebook that once had old coins in it, some socks, a shoe box, and a pair of white tennis shoes that did not belong to him.  Towels were strewn around the house.  He testified that the shower curtain in his bathroom was torn and that a pocket knife, towels, socks, a .22 caliber cartridge box, and a 20 gauge shotgun shell were all on the bathroom counter.  The beds were unmade and had items spread on top of them.   The dresser drawers were open, and items were scattered all around the bedroom, including two walkie-talkies, a belt buckle, a hacksaw, a 12 gauge shotgun barrel and a pad that Mr. Foster once had on his 20 gauge shotgun.

Mr. Foster testified that he kept several guns in a walk-in closet.  He stated that he had a .22 caliber pistol, a Glenfield Model 60 .22 caliber rifle, a Marlin .30-30 caliber lever action rifle, a 20 gauge shotgun, a single shot shotgun, and a Remington 100 12 gauge shotgun.  The 12 gauge shotgun was rendered inoperable by being sawed off too closely and was lying on his bed.  A portion of both the stock and the barrel of the 12 gauge shotgun had been sawed off and the spring from the stock was lying near the gun.  The 20 gauge shotgun

was missing from his house. He, however, identified the 20 gauge shotgun found in the murder victims' car as his own. He was able to identify the 20 gauge shotgun by its serial number. Foster's full name carved into the gun.

A portion of the 20 gauge's barrel had also been sawed off and left in Foster's bedroom. Mr. Foster stated that his .30-30 lever action rifle and some .30-30 accelerator rifle bullets were also missing from his house. The rifle was never recovered. Mr. Foster further testified that .30-30 caliber rifle shells, 20 gauge shotgun shells and 12 gauge shotgun shells were missing after the burglary. The missing 20 gauge shotgun shells ranged from 4 through 7 ½ shot and were of Sears, Winchester, Federal and Montgomery brands. Coins were also missing from Mr. Foster's house.

The authorities were able to lift several latent prints at the Foster residence. A latent left thumb print matching that of Quintero was found on a full box of Federal 12 gauge shotgun shells. A latent right ring fingerprint matching Quintero was found on another Federal 12 gauge shotgun shell box. A right middle finger and a right index fingerprint matching the defendant's were found on a Federal field load 12 gauge shotgun shell box. A right palm print matching that of Quintero was lifted from one of the gun stocks. A latent right ring fingerprint matching that of Hall was lifted from a Diet Pepsi can.

Wayne Vester, the murder victims' son, attempted to reach his parents by telephone once on Monday, June 20, and twice on Tuesday, June 21. Wayne became concerned by his failed attempts to reach his parents. He then called Howard Allor who lived approximately a quarter mile from his parents. Mr. Allor stated that he had last seen Mr. and Mrs. Vester on the morning of June 17, when he ate breakfast with them. Mr. Allor informed Wayne that his parents' car was gone and that he believed they were in Nashville.

Wayne Vester unsuccessfully attempted to locate his parents in Nashville. On June 22, he again called Mr. Allor and asked him to check on his parents. Mr. Allor drove to Wayne's parents' residence where he discovered their dead bodies. He attempted to telephone the sheriff from the victims' residence, but the phone was dead. He then returned to his home and contacted the sheriff's department.

Wayne Vester and his 12-year-old son had visited his parents the weekend prior to the murders. Wayne Vester stated that they arrived at his parents' house on the evening of Friday, June 17, and left Sunday, June 19, at approximately 5:00 or 6:00 p.m. He had taken groceries to his parents including Pepsi Colas, lunch meat, bread, and milk.

David Hicks, the Sheriff of Stewart County, was notified of the Vester murders at approximately 1:00 or 1:30 p.m. on Wednesday, June 22. The Tennessee Bureau of Investigation ("T.B.I.") conducted the primary investigation of the crime scene.

The victims' residence had one entryway which was through a screen door located at the side of the house opposite to the victims' bedrooms. The screen door, however, did not appear to be damaged. An unopened Pepsi Cola can lay beside the walkway to the house's door. The packages of Pepsi Cola that Wayne Vester brought to his parents were no longer on the porch. The screen in the front bedroom window was missing, and the window was open. A concrete block had been placed underneath the front bedroom window. The concrete block appeared to have been taken from in front of a shed located at the back of the house. A cloth glove which matched a glove found at the Crawford residence was on the ground by the concrete block. The victims' maroon 1985 Pontiac Bonneville was missing.

There were three windows along the back of the victims' house. The missing front window screen was lying on the ground near Mrs. Vester's bedroom window which was one of the back windows. The wires to the telephone connection box outside the victims' residence had been damaged, and the line was dead. A live 20 gauge Federal shotgun shell with #6 bird shot was found lying near the electrical box. A spent 20 gauge #4 shot Federal shotgun shell casing was found near the shed approximately 18 feet from Mr. Vester's back bedroom window. The evidence later showed that the spent shell was likely discharged from the sawed-off 20 gauge shotgun taken from the Foster residence.

Mr. Vester's window frame was visibly bent, and a few of the glass louvers were broken. Shards of glass were found lying on Mr. Vester's bed. Both the screen and curtain covering his window had holes in them which indicated that Mr. Vester was shot at least once from outside the house. Mr. Vester's body was found on the floor next to his bed. The covers were drawn back, and there was blood on both the pillow and the bed. Number 4 and #5 bird shot pellets were retrieved from Mr. Vester's room. Two shot shell filler wads were found beside Mr. Vester's body, and a 20 gauge plastic shot wad was recovered from beside his head. A plastic shot sleeve, one shot shell, a plastic shot wad, and several shot pellets, all either #4 or #5 bird shot, were recovered from Mr. Vester's body.

Mrs. Vester's body was found lying on the floor of her bedroom next to the bathroom in a pool of dried blood. Mrs. Vester was shot twice with a 20 gauge shotgun, once with a high-powered rifle, and stabbed thirteen times. A copper jacketed bullet was recovered from her body. The screen covering Mrs. Vester's bedroom window had a hole in it. The condition of the glass louvers, which were open and not broken, indicated that the high-powered rifle or shotgun was held close to the window when fired. At least one shot entered Mrs. Vester's window.

11

Evidence indicated that one shot entered Mrs. Vester's window, hit her arm, ricocheted off the heating unit cover and went out the living room window where the shot wad created a star-shaped hole. Both blood and tissue were found on the heating unit cover and on the ceiling. Shot was sprayed all over the house, especially the kitchen. All of the shot pellets found in the house were either #4 or #5 shot.

Blood was found on Mrs. Vester's bed, and there was a considerable amount of blood on the bathroom floor. Blood was splattered on both the bathtub and the commode. The bottoms of Mrs. Vester's feet were also covered in blood.

The authorities found a pocketbook and a portion of The Tennessean, dated Monday, June 20, 1988, on the victims' sofa. The local mail carrier testified that the victims did not receive The Tennessean via mail. A live 20 gauge shotgun shell with #7 ½ shot was found lying on the floor in the front bedroom next to a ransacked jewelry box.

The medical examiner, Dr. Charles Harlan, testified that the victims died approximately one and one-half to two hours after they consumed dinner. He stated that a minimum of three different weapons were used in murdering the victims. Mrs. Vester's body sustained three gunshot wounds. Gunshot wound A was located at the right portion of her chest just below the collarbone. A copper jacket entered the body at wound A and lodged in Mrs. Vester's left arm. The wound measured approximately a quarter of an inch in diameter and was basically round in shape. Shotgun wound B was located in the upper arm. The defect from this gunshot measured 3.4 inches by 1.8 inches and was jagged with an irregular edge. There were also multiple tangential abrasions associated with wound B. Shotgun wound C was to the right forearm. Mrs. Vester's two forearm

12

bones were severed leaving the hand and wrist attached to the body only by a peninsula of soft tissue. Dr. Harlan testified that the gunshot wound to the right arm could have been from either a high-velocity rifle or a shotgun. He could not determine the order in which the wounds were inflicted.

Dr. Harlan further testified that Mrs. Vester's body had sustained 13 stab wounds. She was stabbed once in the middle of the back and 12 times in the head, neck and shoulder region. A majority of the stab wounds were inflicted to the left side of her head and neck. Dr. Harlan surmised that the puncture wounds were made by a squared object with a sharp edge, such as a kitchen or hunting knife. Two stab wounds severed the right and left common carotid arteries. The right carotid artery was 90 percent severed, and the left was 10 percent severed. Dr. Harlan testified that the injuries to the carotid arteries would have been fatal. He further stated that the gunshot wound severing the right forearm would have been fatal without hospital treatment. Based on his autopsy, Dr. Harlan determined that Mrs. Vester could have survived the brutal attack for up to 15 minutes.

Mr. Vester's body had sustained two gunshot wounds. The central defect from shotgun wound A was located at the head and neck juncture. The total dispersal pattern of shotgun pellets was 13 inches. Wound A caused significant injury to the left lung, aorta, and pulmonary artery. Shotgun wound B was to Mr. Vester's right breast. The total dispersal pattern of shot-gun pellets was approximately six to eight inches. Shotgun wound B caused trauma to Mr. Vester's right lung and to the liver. Dr. Harlan recovered shotgun pellets and a shot column from Mr. Vester's chest and abdomen.

Dr. Harlan determined that Mr. Vester's chest defect indicated a wound consistent with being shot from a shotgun at a range of approximately six to ten

13

feet. The neck wound was sustained by a shotgun discharge from approximately 10 to 12 feet away. Dr. Harlan testified that Mr. Vester could have survived five minutes or a little longer.

Following the discovery of the victim's bodies, the Stewart County Sheriff's Department began checking cabins in the surrounding area. On Thursday, the officers discovered that the Crawford residence, less than a quarter of a mile from the Vesters' residence, had been burglarized. John and Virginia Crawford, from Davidson County, had been at their trailer from the evening of Friday, June 17, until Sunday, June 19, around 2:00 or 2:30 p.m. When they left on Sunday, everything had been clean and orderly at the trailer. When the Crawfords were notified that their trailer had been burglarized, they drove to the trailer and found that the back door had been pried open with a pick. The kitchen was a mess. Canned foods, crackers, and candy bars from the cabinet and refrigerator had been eaten. Prints were lifted from several items in the trailer. A latent left thumb print matching that of Hall was lifted from the bottom of a can of ham. A latent right index fingerprint left by the defendant was lifted from a Butterfinger candy wrapper found inside the refrigerator. The Crawfords identified two gloves found at the trailer, one white jersey and one brown jersey, as belonging to Mrs. Crawford. A patch on one of the gloves had been sewn on by Mrs. Crawford. Mr. Crawford testified that a flashlight had also been taken from the trailer. One of the gloves found at the Crawfords' trailer matched a glove found outside the Vesters' front bedroom window. A fiber analysis of the two gloves indicated that it was likely that they were originally sold together as a pair.

On June 21, 1988, around 8 a.m., employees of the Memphis Funeral Home observed three men in a maroon Pontiac, later identified as the victims' car. The three men in the Pontiac entered the funeral home parking lot and parked approximately 250 feet from the building. Two employees of the funeral

14

home testified that one man got out of the front seat, took off his tank top and put on three additional shirts. The two other men also exited the car. Neither witness could make a positive identification of the three men. They, however, testified that all three men were white and about the same height, but two of the men were probably 180 pounds and had darker hair.

The three men remained in the parking lot for approximately five to seven minutes. Then, after one of them took a satchel out of the trunk, the three men proceeded to walk towards a hospital across the street from the funeral home. One of the men turned, walked back to the car, and appeared to have placed an item back into the car. He then joined the two other men, and they all three walked off. The funeral home workers assumed that the three men were construction workers working at the hospital. When, however, the car was not picked up by Thursday, the funeral employees noticed that the car and its license plate number matched the description of a missing car reported in the newspaper. They then contacted the Memphis Police Department.

On the morning of Thursday, June 23, the Memphis Police Crime Scene Squad responded to the call from the Memphis Funeral Home. The police found a 1985 maroon Pontiac Bonneville in the funeral home's parking lot. The vehicle matched the description of the victims' vehicle. The keys were in the car's ignition. The officers found the sawed-off 20 gauge shotgun taken from the Foster residence under the floor mat behind the driver's seat. The gun was later identified as being the gun that likely discharged the spent shell outside of the victims' residence. The police also discovered a .30-30 caliber cartridge under the floor mat which matched ammunition taken from Mr. Foster's residence. A crumpled Budweiser beer can was found under a seat. Three latent prints identified as belonging to the defendant were lifted from the Budweiser can. No other prints were found in the car. The officer noted that the extremely hot

15

temperatures in Memphis at the time the car was found made it difficult to lift prints. Other items retrieved from the vehicle included a Ray-O-Vac flashlight, electrical tape, thirteen 20 gauge shotgun shells, three 12-ounce Pepsi Colas, one 12-pack of Pepsi Colas, a portable electric air compressor, a Black & Decker car vacuum, and a brown umbrella.

Curtis Jones, who was a security guard at the Memphis Greyhound bus station, testified that he worked Tuesdays and Wednesdays at the bus station in June of 1988. The bus station was located in downtown Memphis approximately one mile from the Memphis Funeral Home. His job at the bus station was to keep individuals out who did not have business at the station. Mr. Jones sat in a booth at the station and watched the doors to observe who came in and to determine whether they later purchased tickets. Periodically, he would walk around and ask people whether they had tickets or if they were waiting for someone to arrive.

Mr. Jones recalled three men entering the bus station either Tuesday, June 21, or Wednesday, June 22, between 11 a.m. and 1 p.m. Two of the men sat down and watched television. One of the two seated men spoke to a man seated nearby. The third man, who had darker skin and appeared Hispanic, used a telephone. Mr. Jones approached the two seated men and asked them whether they had tickets. A man, whom he identified as the defendant, told him that they would leave as soon as their friend finished using the telephone. The three men remained in the station five to ten minutes. Later that same day, the Memphis police stopped by the bus station with a photographic line-up of the eight escapees. Mr. Jones responded that the defendant, Quintero, and Hall had previously been at the station. Later in the week, Mr. Jones spoke with Agent Stout of the T.B.I. Mr. Jones again identified the defendant, Quintero, and

16

Hall from a line-up. Mr. Jones made an in-court identification of the defendant as the person with whom he had spoken at the bus station.

Agent Stout also interviewed two employees at the Blue Movies West adult bookstore and entertainment center located across the street from the bus station. Shirley Denise Morrow testified that she worked as a cashier in the bookstore in June of 1988. On Tuesday, June 21, the day before her birthday, three men entered the bookstore around 9:00 or 10:00 a.m. Two of the men were white and one appeared Mexican. The men traded a few silver dollars and half dollars for tokens. Ms. Morrow also purchased a few silver dollars and half dollars for herself.

The men went to the back of the establishment to watch movies. Approximately ten minutes later, the men then returned to the front of the establishment. They attempted to sell Ms. Morrow what appeared to be a class ring and a wedding band. Ms. Morrow declined and suggested they try a pawn shop. One of the men then indicated that they did not have any identification and offered Ms. Morrow $ 50.00 to let them stay in the movie house until their transportation arrived. Ms. Morrow declined their offer. A dancer then came out from the back of the establishment and said something to the men. The men left, and Ms. Morrow contacted the police.

Agent Stout showed Ms. Morrow a photographic array of the eight escapees. Ms. Morrow identified the defendant, Quintero, and Hall as the three men who visited the bookstore. Agent Stout took six silver dollars that the men had sold to Ms. Morrow. The silver dollars were later identified by Mr. Foster as identical to coins stolen from his residence. Ms. Morrow also made an in-court identification of the defendant.

17

Hall was eventually captured in El Paso, Texas. Both the defendant and Quintero were captured in Mexico near El Paso. Barbara Vasser, Hall's girlfriend at the time, testified that after Hall called her for a third time following the escape, her mother called the Pennsylvania State Police. Ms. Vasser testified that she was afraid for Hall's safety so she agreed that if Hall called again, she would set up a time and place where she could wire Hall money. Hall called Ms. Vasser on July 6, 1988. Vasser agreed to wire him money to the Western Union on North Stanton Street in El Paso, Texas. The Federal Bureau of Investigation ("F.B.I.") was notified, and surveillance was established at the Western Union. Hall entered the Western Union in El Paso at approximately 2:20 p.m. and was apprehended.

The F.B.I. subsequently received leads that both the defendant and Quintero were staying at the Santa Fe Hotel in Juarez, Mexico. Juarez is located just across the border from El Paso, Texas. On July 10, 1988, Quintero and the defendant were apprehended at the hotel by Mexican officials and transported across the international bridge. F.B.I. agents met with Mexican officials at a border check point and took custody of both the defendant and Quintero. An old wallet with an imprint of Mr. Foster's driver's license was found on Quintero.

The defense attempted to present the testimony of both Quintero and Hall. Both convicts, however, invoked their privilege against self-incrimination and refused to testify. The trial court informed the jury that both Quintero and Hall had invoked their right not to testify and instructed both men to hold up their hands for the jury to observe. The defendant was not allowed to introduce into evidence the affidavits prepared by either Quintero or Hall.

The jury convicted the defendant of two counts of first degree premeditated murder, four counts of grand larceny, and three counts of first

degree burglary. During the sentencing phase, the State introduced proof that in 1981 the defendant had been convicted of murder. The State also showed that the defendant pled guilty to first degree wanton endangement in 1985. An officer at the Kentucky State Penitentiary at Eddyville, Kentucky, identified the defendant as one of the eight inmates who had escaped from the facility on June 16, 1988.

Finally, the State introduced additional photographs and testimony concerning Mrs. Vester's body. Mrs. Vester was found lying in her bedroom just outside the bathroom. The State introduced photographs depicting the amount of blood on the bathroom floor and depicting the blood on the bottoms of Mrs. Vester's feet. The State also introduced a photograph of Mrs. Vester's body rolled over so that the jury could see the severity of her injuries and the brutality of the attack.

In mitigation, the defendant presented testimony that he was born on November 8, 1958, in Perry County, Kentucky. He spent a portion of his early childhood in Hazard County, Kentucky. Julie Maddox, a psychological examiner and an expert in the field of psychological testing, testified as to the results of various tests that she administered to the defendant. The first test was the Bender Gestalt Test, which is designed to determine whether a person has any severe brain damage. Ms. Maddox found no signs of traumatic brain damage in the defendant. The defendant, however, appeared to be intellectually impaired.

The second test administered was the Wide Range Achievement Test, revised ("WRAT"). The defendant achieved a score of 20 out of 66 in arithmetic placing him in the .1 percentile and at a fourth grade level. The defendant achieved a score of 8 out of 51 in spelling which placed him in the .2 percentile

and at a fourth grade level. The defendant scored 29 out of 89 in reading which placed him in the .2 percentile and at a level lower than the third grade.

Ms. Maddox also administered the Wexler Adult Intelligence Scale Revised Test ("Wexler") which measures I.Q. The defendant received a verbal I.Q. level of 74, a performance I.Q. level of 77, and a full-scale I.Q. level of 74. This score placed the defendant in the lower three percentile range indicating that ninety-seven percent of the population scored higher. The error range on this test is plus or minus five points. Ms. Maddox testified that a score of 90 to 109 is considered average and a score of 70 or below indicates mild mental retardation.

Ms. Maddox further administered a Minnesota Multi-Phase Personality Inventory ("MMPI") but stated that she had not brought that test with her. She testified that there were no indications from the test that the defendant was malingering.

Next, the defense presented the testimony of Susan Cannon, executive director of PEACE, Inc. (Project to End Abuse Through Counseling and Education) located in Nashville, Tennessee. She introduced into evidence the defendant's school records from first through eighth grade. She also testified that male children typically learn violent behavior at home and repeat it in their own home as an adult.

The defendant's maternal aunt, Lucy Coots, testified that she has lived her entire life in Perry County, Kentucky. She testified that the defendant's father, George Blanton, was a violent man who would come home drunk and beat his wife and children. She further testified that the defendant grew up under difficult family and economic conditions. The defense presented two CBS

documentaries on living conditions in Perry and Knott Counties, Kentucky, during the time the defendant was growing up. Ms. Coots testified that the documentaries accurately depicted the living conditions of the defendant's family. After the defendant's father went to prison, the defendant's mother married another man who was a good father to the children. He died of cancer about two years after the marriage. The defendant's mother died about three years after the death of the defendant's stepfather. Ms. Coots testified that the defendant often called her on the telephone and wrote her letters.

The defendant's brother and sister testified. They confirmed Ms. Coots' testimony concerning the Blanton family's living conditions. The defendant had six siblings, one of whom died from muscular dystrophy. Neither witness had seen or heard from the defendant in ten or eleven years. One of the defendant's brothers is incarcerated in the Kentucky State Penitentiary at Eddyville, Kentucky.

In rebuttal, the State presented Dr. Samuel Craddock, who testified that he was part of an investigation team that interviewed the defendant on April 17, 1991. From his examination, Dr. Craddock determined that the defendant was functioning in the low/average or dull/normal range of intelligence depending on which edition of the Wexler Intelligence Scale was used.

Finally, the State presented testimony that the defendant had sent several coded letters to Joseph Montgomery in the Kentucky State Penitentiary while the defendant was in the Tennessee Department of Correction. Although the letters contained numerous capitalization and spelling errors, they were introduced to rebut testimony that the defendant was of low intelligence.

Based on this proof, the jury sentenced the defendant to death for the murders of Buford and Myrtle Vester.

**HEINOUS, ATROCIOUS, AND CRUEL**

The defendant argues that Tenn. Code Ann. § 39-13-204(i)(5) was not an appropriate basis for sentencing him to death.  His argument is premised on the following contentions:  (1)  that the evidence is insufficient to support application of (i)(5); (2)  that there is no evidence indicating that the defendant stabbed or shot the victims; (3)  that the trial court erred in instructing the jury on the pre-1989 version of (i)(5) in 1991; and (4)  that (i)(5) as instructed was unconstitutionally vague prior to the 1989 amendment.  We disagree.

Upon review, we find that the evidence is clearly sufficient to support a jury finding that Mrs. Vester's murder was heinous, atrocious and cruel.  The evidence indicates that Mr. and Mrs. Vester were in their beds prior to being murdered.  Mrs. Vester's room was separated from Mr. Vester's room by a small bathroom.  The perpetrators positioned themselves by both Mr. and Mrs. Vesters' bedroom windows.  The perpetrators then shot the Vesters from outside the house while the Vesters lay in their beds.

Mrs. Vester was initially shot at least once while she lay in bed.  At least one shot originated from outside her bedroom window.  She apparently attempted to save her life by fleeing into an adjacent bathroom.  The bathroom was in a direction away from her window and toward Mr. Vester's room which also received gunfire.  The perpetrators then entered the Vester residence.

Mrs. Vester sustained a shotgun blast to her right forearm which severed both bones in her forearm.  Her wrist, hand and lower arm were left attached to

22

her upper forearm only by a small peninsula of skin and flesh. She sustained one shotgun blast to her right shoulder which left a wound nearly three-and-one-half inches by two inches. She was also shot with a high-powered rifle. The high-powered rifle shot entered her upper chest just below her right collar bone.

The evidence indicates that Mrs. Vester struggled to save her life while her arm was practically severed from her body. The bottoms of her feet were covered in blood indicating that she had walked through her own pool of blood in an attempt to flee the attack. She, however, was stabbed once in the left cheek, seven times in the left side of her neck, twice in the front of her neck (once on the left side and once on the right side), once just below the right collar bone (next to the defect caused by the high-powered rifle), once to the left shoulder, and once in the middle of her back. The medical evidence presented indicates that Mrs. Vester could have remained alive for as long as fifteen minutes during the brutal attack or after receiving her wounds. She then apparently died face down in a pool of her own blood. The evidence amply supports a finding of torture under Tenn. Code Ann. § 39-13-204(i)(5).

"In proving that torture occurred, the State, necessarily, also proves that the murder involved depravity of mind." State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985). The defendant's actions were reprehensible. He shot the victims initially from outside their home. He then entered the victims' residence whereupon he inflicted numerous wounds upon Mrs. Vester. The multiplicity of the wounds, the infliction of gratuitous violence and the evidence of torture amply supports a finding of depravity of mind under Tenn. Code Ann. § 39-13-204(i)(5).

The defendant's next contention is that "there is no evidence that James Blanton shot or stabbed [Mrs.] Vester." This contention, however, is best addressed by a sufficiency of the evidence review. The jury found the defendant

23

guilty of murdering Mrs. Vester. The Court of Criminal Appeals found that the evidence was sufficient to support the conviction. Upon review of the record, we hold that the evidence was clearly sufficient to support the convictions.

The defendant's next assignment of error is that the trial court erred in instructing the jury with the pre-1989 version of Tenn. Code Ann. § 39-13-204(i)(5). The defendant murdered the victims in 1988 prior to the effective date of the 1989 revisions. Accordingly, the jury was properly charged as to the aggravating circumstance as defined by the pre-1989 statute. State v. Brimmer, 876 S.W.2d 75 (Tenn. 1994).

The defendant argues that the pre-1989 version of (i)(5), as charged, was unconstitutionally vague. He specifically argues that the phrase "depravity of mind" rendered the pre-1989 statute unconstitutional. This Court, however, has previously held that the pre-1989 (i)(5) aggravating circumstance was neither unconstitutionally vague nor over broad. See State v. Williams, 690 S.W.2d 517, 526-30, 533 (Tenn. 1985); State v. Barber, 753 S.W.2d 659, 670 (Tenn. 1988), cert. denied, 488 U.S. 900, 109 S.Ct. 248, 102 L.Ed.2d 236 (1988); State v. Black, 815 S.W.2d 166, 181 (Tenn. 1991) (Reid, C.J., Daughtrey, J. concurring and dissenting). This issue is without merit.

**INSTRUCTING ON ALL AGGRAVATING CIRCUMSTANCES**

The defendant makes basically three assignments of error concerning the trial judge's instructions to the jury on the aggravating circumstances. First, he argues that the trial court erred in instructing the jury on every felony under Tenn. Code Ann. § 39-13-204(i)(7). He further argues that the trial court erred in instructing the jury on all twelve aggravating circumstances. Finally, he argues

that the trial court erred by failing to require the jury to find, pursuant to (i)(5), that the defendant had the specific intent to torture the victim.

The jury found aggravating circumstance (i)(7) applicable. Specifically, the jury found that the victims' murders were "committed while the defendant was engaged in committing or was an accomplice in the commission of, or was attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnaping, aircraft piracy, or unlawful throwing, placing, or discharging of a destructive device or bomb." The defendant argues that because the trial judge charged every felony listed under (i)(7), "one may conclude that the jury found murder in the commission of murder, or murder in the commission of air piracy."

The better practice certainly is to charge those felonies that may be supported by the facts. State v. Buck, 670 S.W.2d 600, 608 (Tenn. 1984). Moreover, charging all felonies under (i)(7) without regard to whether the felonies are supported by the evidence is error. We, however, find the error harmless as application of the (i)(7) aggravating circumstance is amply supported by the evidence.

The defendant assigns error in the trial judge's decision to instruct the jury on all twelve aggravating circumstances. The Court of Criminal Appeals held that, while error, the error was harmless, because the evidence supported the jury's application of (i)(2), (i)(6), and (i)(7) for both murders. In addition, the jury found (i)(5) applicable only to the murder of Mrs. Vester. This finding indicates that the jury thoroughly reviewed the evidence and applied the aggravating circumstances in a non-arbitrary manner. Upon review, we agree with the appellate court's holding and find no reversible error as to instructing the jury on all twelve aggravating circumstances.

25

The defendant contends that (i)(5) required the jury to find that the defendant had the specific intent to torture the victim.[1]  Circumstance (i)(5), however, does not require a mens rea.  We find that (i)(5) focuses on the circumstances of the killing.  We, therefore, hold that the torture prong of (i)(5) merely requires a jury finding that the victim remained conscious and sustained severe physical or mental pain and suffering between the infliction of the wounds and the time of death.  Whether the defendant intended the victim's suffering is irrelevant under (i)(5).  This issue is without merit.

## COMPARATIVE PROPORTIONALITY REVIEW

In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder.  State v. Hall, 958 S.W.2d 679 (Tenn. 1997).  A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed."  Id. (citing State v. Ramsey, 864 S.W.2d 320, 328 (Mo. 1993)).  A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence.  State v. Bland, 958 S.W.2d 651 (Tenn. 1997) (citing State v. Carter, 714 S.W.2d 241, 251 (Tenn. 1986)).  Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics."  Bland, 958 S.W.2d at 665.  Our duty "is to assure that no aberrant death sentence is affirmed."  Id. (citing State v. Webb, 680 A.2d 147, 203 (Conn. 1996)).

---

[1] We note that the jury was instructed pursuant to State v. Williams, 690 S.W.2d 517 (Tenn. 1985), on circumstance (i)(5).

26

Our proportionality review is neither a rigid nor an objective test. Hall, 958 S.W.2d at 699. There is no "mathematical formula or scientific grid," and we are not bound to consider only cases in which the same aggravating circumstances were found applicable by a jury. Id.; State v. Brimmer, 876 S.W.2d 75, 84 (Tenn. 1994). This Court considers many variables when choosing and comparing cases. Bland, 958 S.W.2d at 667. Among these variables are: (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims. Id.; Hall, 958 S.W.2d at 699. Factors considered when comparing characteristics of defendants include: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); and (8) the defendant's capacity for rehabilitation. Id.; Bland, 958 S.W.2d at 667.

Justice Reid opines in his dissenting opinion that a sentence of death in this case is disproportionate to sentences in similar capital cases because the evidence here does not show that the defendant himself killed or was an active participant in the killing. By its verdict, however, the jury in this case found beyond a reasonable doubt that the defendant committed premeditated first degree murder. An appellate court is no longer concerned with the sufficiency of the evidence when performing a comparative proportionality review. A reviewing court shall construe the circumstances of the case in a manner in full accord with the jury's verdict and compare those facts with the circumstances of similar

27

cases. The reviewing court, therefore, must consider proven the fact that the defendant was involved in the crime to the degree that he is criminally responsible for the murder.

We have reviewed Rule 12 reports from trial judges submitted over the past eighteen years in all criminal trials for first degree murder in which life imprisonment or a sentence of death has been imposed. We have made an independent, conscientious and thorough review of this case, as we have in every other capital case that has been before this Court. Considering the brutality of the defendant's crime and his characteristics, we find that imposition of the death penalty in this case is not disproportionate to the penalty imposed in similar cases. Mrs. Vester was sixty-nine years old at the time the defendant murdered her. She was shot at least once from outside her house while she lay in bed. Her husband was shot and murdered in an adjacent room. He died of multiple shotgun wounds to the head, neck and chest.

The evidence indicates that Mrs. Vester struggled to evade the brutal attack that severed her forearm and left her wrist and hand attached only by a small peninsula of soft tissue. The record indicates that she was shot twice with a shotgun and shot once with a high-powered rifle. She was then stabbed thirteen times. The stab wounds were to her face, head, neck, shoulder, back and upper chest. The bottoms of her feet were covered in blood indicating that she attempted to flee the attack by walking through her own pool of blood. Medical testimony indicates that she survived for as long as fifteen minutes following the infliction of her wounds.

The defendant had escaped from prison and was fleeing authorities when he murdered the victims. The defendant had a criminal record of violent crimes which included a prior murder conviction and first degree wanton endangerment.

28

The defendant has neither shown remorse nor appears to be a candidate for rehabilitation. The defendant committed these brutal crimes only three days after escaping from the confines of a penitentiary and entering society. The nature of Blanton's crime, his criminal background, his infliction of unnecessary and gratuitous violence and his complete disregard for human life places him into that class of criminals for whom a sentence of death is appropriate.

Cases that are comparable concerning multiplicity of wounds, infliction of gratuitous violence, and the defendant's IQ range are as follows: State v. Payne, 791 S.W.2d 10 (Tenn. 1990); State v. Jones, 789 S.W.2d 545 (Tenn. 1990); State v. Thompson; 768 S.W.2d 239 (Tenn. 1989); State v. McNish, 727 S.W.2d 490 (Tenn. 1987); State v. Barber, 753 S.W.2d 659 (Tenn. 1988); State v. Melson, 638 S.W.2d 342 (Tenn. 1982).

In State v. Payne, 791 S.W.2d 10 (Tenn. 1990), a twenty-year-old defendant was convicted on two counts of premeditated murder and sentenced to death on both counts. In Payne, the defendant stabbed one victim approximately forty-two times and the other victim approximately nine times. The defendant's IQ was in the range of 70 to 100. This Court affirmed both sentences of death based on Tenn. Code Ann. § 39-2-203(i)(3) & (5).

In State v. Jones, 789 S.W.2d 545 (1990), a thirty-eight year-old defendant was convicted of both premeditated and felony murder and sentenced to death. In Jones, the defendant bound, gagged and blindfolded the victim who was then stabbed six times. The defendant's IQ was in the range of 70 to 100. This Court affirmed his death sentence based on Tenn. Code Ann. § 39-2-203(i)(2), (5) & (7).

In State v. Thompson, 768 S.W.2d 239 (Tenn. 1989), a twenty-two-year-old defendant was convicted of felony murder and sentenced to death. In Thompson, the defendant abducted his female victim at gunpoint and took her to a remote location. He then repeatedly stabbed the victim inflicting two fatal wounds to the right lung. Testimony indicated that the victim could have remained conscious for five to ten minutes. The defendant's IQ was in the range of 70 to 100. This Court affirmed the death sentence based on Tenn. Code Ann. § 39-2-203(i)(5), (6) & (7).

In State v. Barber, 753 S.W.2d 659 (Tenn. 1988), a twenty-nine-year-old defendant was convicted of felony murder and sentenced to death. In Barber, the defendant repeatedly struck his seventy-year-old female victim in the head with a crescent wrench. Evidence indicated that the victim remained alive while the blows were inflicted. The trial judge described the defendant's IQ as average. In mitigation, the trial judge listed that the defendant was capable of rehabilitation. This Court affirmed the death sentence based on Tenn. Code Ann. § 39-2-203(i)(5) & (7).

In State v. McNish, 727 S.W.2d 490 (Tenn. 1987), a twenty-nine-year-old defendant was convicted of first degree murder and sentenced by the jury to death. In McNish, the defendant murdered a seventy-year-old female victim by striking her in the head repeatedly with a glass vase. The victim survived the attack for a short time but later died from hemorrhaging of the brain. The defendant's estimated IQ was in the range of 70 to 100. This Court affirmed his sentence of death based on Tenn. Code Ann. § 39-2-203(i)(5).

In State v. Melson, 638 S.W.2d 342 (Tenn. 1982), a forty-eight-year-old defendant was convicted of premeditated murder and sentenced to death by a jury. In Melson, the victim died from multiple blunt traumas to the head and neck

after the defendant struck the victim approximately 15 to 30 times with a hammer.  The defendant's IQ was in the range of 70 to 100.  This Court affirmed the death sentence based on Tenn. Code Ann. § 39-2-203(i)(5) & (i)(6).

Cases in which this Court has affirmed a sentence of death with comparable or less gratuitous violence and multiplicity of wounds and with a defendant having a lower IQ are as follows:  State v. Smith, 893 S.W.2d 908 (Tenn. 1994); State v. Smith, 695 S.W.2d 954 (Tenn. 1985); State v. Coleman, 619 S.W.2d 112 (Tenn. 1981).

In State v. Smith, 893 S.W.2d 908 (Tenn. 1994), a forty-one-year-old defendant was convicted of felony murder and sentenced to death.  In Smith, the defendant broke into an eighty-eight-year-old woman's home.  He robbed her, raped her, cut her throat and placed her into a bathtub full of water.  The victim was alive when water entered her lungs.  The defendant suffered from diminished intellectual capacity and was classified as "mentally retarded."  This Court affirmed the death sentence based on Tenn. Code Ann. § 39-13-203(i)(2) & (5).

In State v. Smith, 695 S.W.2d 954 (Tenn. 1985), a twenty-three-year-old defendant was convicted of felony murder and sentenced to death.  In Smith, the defendant robbed and killed a seventy-one-year-old male.  The victim was shot twice.  The defendant's IQ was in a range lower than Blanton's IQ range.  The defendant, unlike Blanton, confessed and cooperated with the police.  This Court affirmed the death sentence based on Tenn. Code Ann. § 39-2-203(i)(7).

In State v. Coleman, 819 S.W.2d 112 (Tenn. 1981), a twenty-two-year-old defendant was convicted of felony murder and sentenced to death.  In Coleman, the defendant shot and robbed a sixty-nine-year-old victim.  The defendant's IQ

was in a range lower than Blanton's IQ range. This Court affirmed the death sentence based on Tenn. Code Ann. § 39-2-203(i)(2) & (7).

Cases in which this Court has affirmed a sentence of death with less gratuitous violence and where the evidence did not positively identify the shooter include: State v. Sample, 680 S.W.2d 447 (Tenn. 1984); State v. McKay, 680 S.W.2d 447 (Tenn. 1984); State v. Dicks, 615 S.W.2d 126 (Tenn. 1981); State v. Strouth, 620 S.W.2d 467 (Tenn. 1981).

In State v. Sample, 680 S.W.2d 447 (Tenn. 1984), a twenty-five-year-old defendant was convicted of felony murder and sentenced to death. In Sample, two clerks were shot to death during a robbery. Sample appeared to be the leader in the commission of the crime with his partner McKay who also received a sentence of death. The evidence, however, did not establish the identity of the shooter. This Court affirmed the death sentence based on Tenn. Code Ann. § 39-2-203(i)(3),(6) & (7).

In State v. McKay, 680 S.W.2d 447 (Tenn. 1984), a twenty-five-year-old defendant was convicted of felony murder and sentenced to death. In McKay, two clerks were shot during the course of a robbery. Evidence did not indicate that McKay was the leader in commission of the crime. Evidence also did not establish the shooter's identity. McKay was a codefendant with Sample who also received a sentence of death. This Court affirmed the death sentence based on Tenn. Code Ann. § 39-2-203(i)(2), (3), (6) & (7).

In State v. Dicks, 615 S.W.2d 126 (Tenn. 1981), a twenty-one-year-old defendant was convicted of felony murder and sentenced to death. In Dicks, the defendant and his codefendant Strouth robbed a store. During the course of the robbery, Strouth apparently slit the throat of a seventy-year-old male who bled to

death. This Court affirmed the death sentence based on Tenn. Code Ann § 39-2-203(i)(5) & (7).

In State v. Strouth, 620 S.W.2d 467 (Tenn. 1981), a nineteen-year-old defendant was convicted of felony murder and sentenced to death. In Strouth, a store clerk was killed during the course of a robbery committed by Strouth and his codefendant Dicks. Strouth apparently inflicted the fatal throat laceration from which the victim bled to death. This Court affirmed the sentence of death based on Tenn. Code Ann. § 39-2-203(i)(5) & (7).

We also note that there are several cases with comparable violence in which defendants have received life sentences. See State v. Jack Jay North, No. 02C01-9512-CC-00369 (Tenn. Crim. App., at Jackson, Dec. 12, 1996), appeal denied, (Tenn. 1997) (sentencing to life where victim shot multiple times with sawed-off shotgun); State v. James Morning Craft, Jr. and Lewis Moorlet, C.C.A. No. 31 (Tenn. Crim. App., at Jackson, Mar. 8, 1989), appeal denied, (Tenn. 1989) (sentencing to life where victim shot three times). In both North and Craft, the defendants either admitted to being at the scene or showed remorse. Although these cases are similar to some extent, the similarities do not make Blanton's death sentence disproportionate. In fact, the circumstances and violence of Mrs. Vester's killing were far worse than a great majority of the previously cited cases in which the death sentence has been affirmed by this Court. Furthermore, this Court has previously affirmed a number of additional cases in which both the gratuitous violence and the multiplicity of wounds were far less than those present in this case. See State v. Houston, 593 S.W.2d 267 (Tenn. 1980) (affirming death sentence based on (i)(5), (6) & (7) where victim shot three times); State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985) (affirming sentence of death based on (i)(5) & (7) where defendant robbed victims then shot them and slit their throats); State v. King, 718 S.W.2d 241 (Tenn. 1986)

(affirming death sentence based on aggravating circumstances (i)(2), (5), (6) & (7) where victim placed in trunk of car then shot once in head with high-powered rifle); State v. Bates, 804 S.W.2d 868 (Tenn. 1991) (affirming sentence based on (i)(2), (6) & (7) where defendant tied victim to tree and shot victim in head with shotgun); State v. Brimmer, 876 S.W.2d 75 (Tenn. 1994) (affirming death sentence based on (i)(7) where victim tied to a tree and choked to death); State v. Hodges, 944 S.W.2d 346 (Tenn. 1997) (affirming death sentence based on (i)(2) & (5) where victim bound and later strangled).

We have reviewed numerous cases in which either the death penalty or a lesser sentence has been imposed. While no two cases are identical, many cases share similarities with the case now before us. In a great majority of the cases cited, defendants of comparable intellect beat, tortured and assaulted unresisting and defenseless victims without provocation. Upon reviewing the facts of the case now before us, we find that the multiplicity of wounds and the manner of their infliction upon Mrs. Vester were particularly heinous, atrocious and cruel. Moreover, the infliction of gratuitous violence in this case appears to be worse than that inflicted in a substantial number of cases in which this Court has previously affirmed a sentence of death. The penalty imposed by a jury in this case is clearly not disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c)(1) and the principles adopted in prior decisions of this Court, we have considered the entire record in this case and find that the sentence of death was not imposed in an arbitrary fashion. The evidence clearly supports the jury's finding of the aggravating circumstances and that no mitigating circumstances sufficiently outweighed the aggravating circumstances. Tenn. Code Ann.

§ 39-13-206(1)(A) - (C). We have carefully reviewed the defendant's assignments of error and have found that they are either devoid of merit or do not require reversal. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals, authored by Judge Paul G. Summers, joined in by Gary R. Wade and concurred in by Judge Joseph M. Tipton. The defendant's sentence of death by electrocution is affirmed. The sentence will be carried out as provided by law on the 15th day of October, 1998, unless otherwise ordered by this Court or other proper authorities.

_____
JANICE M. HOLDER, JUSTICE


CONCURRING:

Anderson, C.J.
Drowota, J.


SEPARATE CONCURRING AND DISSENTING OPINIONS:

Birch, J.
Reid, J.