IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
April 11, 2000 Session

## STATE OF TENNESSEE v. TYRONE CHALMERS

**Appeal from the Criminal Court for Shelby County**
**No.  95-04473, 74    Carolyn W. Blackett, Judge**

---

**No. W1997-00174-SC-DDT-DD - Filed October 5, 2000**

---

ADOLPHO A. BIRCH, JR., J., concurring and dissenting.

The comparative proportionality review is intended to guard against the arbitrary imposition of the death penalty, and I agree with the majority that race is a factor which must be considered if proportionality review is to accomplish its purpose.  The majority opinion, however, fails to provide any guidance as to how race is to be considered in that analysis.  Without such guidance, the objective of comparative proportionality review is lost.  Moreover, there is evidence that the pool of capital cases examined in proportionality reviews conducted by this Court may be "race-tainted."[1] If this is so, comparing a death-sentenced defendant's race to the race of defendants in prior capital cases does nothing to prevent the arbitrary imposition of capital punishment.

Thus, the lack of guidance, the use of a pool which is probably "race-tainted," and the subjective manner in which these reviews are conducted make their efficacy questionable.  Because of these views, I cannot agree to impose the death penalty in this case and therefore dissent.

I

Before examining the role of race in comparative proportionality review, its impact upon capital punishment in general must be addressed.  Several commentators have questioned whether race improperly influences the decision of which defendants should be executed.

A nationwide review performed by the United States General Accounting Office (USGAO) of more than two dozen studies on death sentencing found that "[i]n 82 percent of the studies, race of victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty, i.e., those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks."  United States General Accounting Office, Death Penalty

---

[1] "Race-tainted" is used to describe those cases in which racial prejudice has influenced either the prosecutor's decision to seek the death penalty or the jury's decision to impose a death sentence.

Sentencing: Research Indicates Pattern of Racial Disparities at 5 (Feb. 1990) reprinted in 136 Cong. Rec. S6889-90 (daily ed. May 24, 1990). Additionally, the USGAO's review revealed that "more than half of the studies found that the race of the defendant influenced the likelihood of being charged with a capital crime or receiving the death penalty." Id.[2]

Perhaps the most widely cited analysis of this issue in the context of a case is found in McCleskey v. Kemp, 481 U.S. 279, 107 S. Ct. 1756 (1987). The case arose in Georgia, and McCleskey offered statistical evidence showing that the death penalty in Georgia was more likely to be imposed upon Afro-American defendants, particularly when the victim was Caucasian. Id. at 286-87, 107 S. Ct. 1764-65 (discussing D. Baldus, C. Pulaski, & G. Woodworth, Comparative Review of Death Sentences: An Empirical Study of the Georgia Experience, 74 J. Crim. L. & Criminology 661 (1983)). Although a bare majority of the Court upheld McCleskey's conviction, Justice Brennan pointed out in dissent that McCleskey's statistics raised serious questions about the fairness of the death penalty:

> At some point in this case, Warren McCleskey doubtless asked his lawyer whether a jury was likely to sentence him to die. A candid reply to this question would have been disturbing. First, counsel would have to tell McCleskey that few of the details of the crime or of McCleskey's past criminal conduct were more important than the fact that his victim was white. . . . [F]rankness would compel the disclosure that it was more likely than not that the race of McCleskey's victim would determine whether he received a death sentence: 6 of every 11 defendants convicted of killing a white person would not have received the death penalty if their victims had been black, while, among defendants with aggravating and mitigating factors comparable to McCleskey's, 20 of every 34 would not have been sentenced to die if their victims had been black. Finally, the assessment would not be complete without the information that cases involving black defendants and white victims are more likely to result in a death sentence than cases featuring any other racial combination of defendant and victim. The story could be told in a variety of ways, but McCleskey could not fail to grasp its essential narrative line: there was a significant chance that race would play a prominent role in determining if he lived or died.

---

[2]The USGAO conceded that the evidence of a connection between the defendant's race and the death penalty was "equivocal" in comparison to the connection associated with the victim's race. This is significant because the victim in the pending case was Afro-American. Evidence that the victim's race improperly influences capital punishment is relevant here, however, because such evidence would tend to affect the reliability of comparative proportionality review in any case where race is a factor. If the pool of cases upon which we rely for comparative proportionality review is race-tainted, then considering a defendant's race in comparison to that pool lends no protection against racial bias in capital punishment.

Id. at 321 (Brennan, J., dissenting) (citations omitted).  More recently, in State v. Harvey, Justice Handler of the New Jersey Supreme Court stated in dissent that "the evidence that prosecutors and juries are significantly more likely to charge with and sentence to death black defendants killing white victims, is overwhelming."  731 A.2d 1121, 1194 (N.J. 1999).  While a complete review of the evidence linking race and capital punishment is beyond the scope of this opinion, the overwhelming conclusion is that "[e]ven under the most sophisticated death penalty statutes, race continues to play a major role in determining who shall live and who shall die."  Callins v. Collins, 114 S. Ct. 1127, 1135 (1994) (Blackmun, J., dissenting).

II

Because of the final, irrevocable nature of the death penalty, we must be cautious to insure that its imposition is not tainted by racial prejudice. Cf. State v. Cobb, 743 A.2d 1, 136 (Conn. 1999) (Berdon, J., dissenting) ("When death is the consequence there is no margin for error.").  Such caution mandates that Tennessee impose reliable safeguards to prevent racial discrimination from infecting the capital sentencing protocol and its appellate review.  Until this is done, we cannot be certain that the death penalty is being imposed in a fair and constitutional manner.  Unfortunately, the majority's analysis of proportionality review in the case before us, in my view, fails to provide the necessary safeguards against the improper consideration of race in the imposition of capital punishment.

The majority opinion devotes but a single paragraph to analyzing the role of race in comparative proportionality review.  Under the circumstances, this analysis falls far short, in my view, of providing the criteria necessary to safeguard against the improper consideration of race in the imposition of capital punishment.  The majority states that "race is considered when performing comparative proportionality review to ensure that an aberrant death sentence was not imposed due to the defendant's race."  Unfortunately, the opinion fails to suggest how a reviewing court should determine whether a death sentence was imposed "due to" race.  As discussed above, numerous studies have indicated that racial bias may play a significant role in determining which defendants receive the death penalty.  Without some assurance that Tennessee's death penalty cases have remained free from such bias, it is unclear how comparative proportionality review could ever ensure that race-motivated death sentencing does not occur.  If a defendant's sentence is compared to a pool of cases which are similarly race-tainted, the reviewing court is without a benchmark by which to determine whether the defendant's sentence is "aberrant."

Furthermore, the majority does not clarify whose race should be considered in comparative proportionality review–the defendant's, the victim's, or both.  In State v. Bland, the Court addressed the list of factors to be considered in proportionality review.  958 S.W.2d 661, 667 (Tenn. 1997).  In addressing the characteristics of defendants, the Bland Court listed "age, race, and gender" as factors to be considered.  However, in addressing the characteristics of victims, the Court listed only "the similarity of the victims' circumstances including age, physical and mental conditions."  Id.  Although the Bland Court did recognize that its list was "by no means . . . exhaustive," see id., the Tennessee Supreme Court has never clearly stated that the victim's race should be considered in

-3-

comparative proportionality review. Given the vast array of evidence indicating that racial disparities in death sentencing are at their greatest in cases where an Afro-American defendant has killed a Caucasian person, we should clearly establish that the victim's race and the defendant's race bear equal significance in comparative proportionality review.

III

In addition to the difficulties inherent in the comparison of race in comparative proportionality review, the manner in which proportionality review itself is conducted raises significant concerns. In order to meet constitutional requirements, a protocol of capital punishment must provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." Bland, 958 S.W.2d at 675 (Tenn. 1997) (Reid, J., concurring and dissenting) citing Furman v. Georgia, 408 U.S. 238, 313, 92 S. Ct. 2726, 2764 (1972) (White, J., concurring). Although comparative proportionality review itself is not constitutionally required,[3] the Tennessee legislature has chosen comparative proportionality review as a means of providing the "meaningful basis" required by the constitution. See Bland, 958 S.W.2d at 675 (Reid, J., concurring and dissenting). Unfortunately, the manner in which we conduct our comparative proportionality review fails to accomplish this objective. The review procedures are ineffective for three reasons: the "test" we employ is so broad that nearly any sentence could be found proportionate; our review procedures are too subjective; and the "pool" of cases which are reviewed for proportionality is too small.

The proportionality review procedures employed by the Court make it exceedingly difficult for defendants to show that their death sentences are disproportionate. In State v. Bland, the Court created a narrow "totality of the circumstances" approach for determining whether a defendant's death sentence is disproportionate. 958 S.W.2d at 665. The Court first outlined the test to be used in comparative proportionality review: "If the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty is imposed, the sentence of death in the case being reviewed is disproportionate." Id. (emphasis added). The Court then stressed that it would not find a death sentence to be disproportionate merely because the defendant could point to comparable cases where the death penalty was not imposed, because "[e]ven if a defendant receives a death sentence when the circumstances of the offense are similar to those of an offense for which a defendant has received a life sentence, the death sentence is not disproportionate where the Court can discern some basis for the lesser sentence." Id. Furthermore, even if a defendant could show that other defendants received life sentences for similar crimes and the reviewing court could not discern some basis for the difference in treatment, this would not necessarily spare the defendant. As stated by the Bland Court, "where there is no discernible basis for the difference in sentencing, the death sentence is not necessarily disproportionate. This Court is not required to determine that a sentence less than death was never imposed in a case with similar characteristics." Id.

---

[3] See Pulley v. Harris, 465 U.S. 37, 50-51 (1984).

-4-

Because our current comparative proportionality review system lacks objective standards, comparative proportionality analysis seems to be little more than a "rubber stamp" to affirm whatever decision the jury reaches at the trial level. Justice Handler of the New Jersey Supreme Court, criticizing New Jersey's protocol, a comparative proportionality review protocol similar to Tennessee's, described such reviews as "an inherently subjective exercise that 'invokes culpability assessments by the court, which are, essentially, moral judgments' . . . . [A] death sentence can always be justified given the level of individuality afforded the analysis." State v. Harvey, 731 A.2d 1121, 1179 (1999) (Handler, J., dissenting) (quoting State v. Loftin, 724 A.2d 129 (1999) (Handler, J., dissenting)). Without some objective standard to guide reviewing courts, "proportionality" becomes nothing more than a statement that the reviewing court was able to describe the case before it in terms comparable to other capital cases. In the pending case, the range of similar cases was broadly defined to encompass "cases involving the shooting of a randomly chosen victim during a robbery." Had the Court chosen different factors and defined the comparable cases more narrowly, it is possible that the number of "similar" cases in which the death penalty had been upheld would be much smaller.

Furthermore, Tennessee's system of comparative proportionality review does not consider all prior cases in which the death penalty could have been imposed. Therefore, it fails to protect defendants from arbitrary prosecutorial decisions. In Bland, the Court determined that courts applying comparative proportionality review should consider only "those cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death by electrocution." Bland, 958 S.W.2d at 666. Thus, the large segment of first degree murder cases in which the prosecutor chose not to seek the death penalty are excluded from comparative proportionality review. As I stated in my dissent in Bland, "[d]efendants are often convicted of first degree murder after a trial in which the prosecution, for whatever reason, did not seek the death penalty. . . . However, cases in which the death penalty is not sought are equally relevant to proportionality as cases in which the death penalty is sought." Id. at 679. Unless we compare all cases in which the death penalty could have been imposed, a reliable finding of proportionality is impossible.[4]

Despite the weaknesses of comparative proportionality review, we continue to insist that courts, prosecutors, and defense counsel expend time and resources conducting these reviews, just as we continue to insist that we are protecting defendants from the unfair imposition of the death penalty. In his concurrence and dissent in Bland, Justice Reid noted that not one of the 116 death sentences the Court had reviewed at the time had been found disproportionate, and he cautiously noted that "whether the [comparative proportionality review] procedure . . . will produce more than

_____

[4]The Bland Court implied that a comparative proportionality review which encompassed non-death penalty cases would entail an impermissible review of prosecutorial discretion. See id. n.17 (citing State v. Whitfield, 837 S.W.2d 503, 515 (Mo. 1992)). However, a primary purpose of comparative proportionality review is to "guard against the capricious or random imposition of the death penalty." Id. at 665. If the evidence were to show that the death penalty had been arbitrarily applied because prosecutors treated similar cases differently for no rational reason, such random choices between life and death should not be accepted by this Court any more than if the same result had been created by aberrant juries.

the routine affirmation of jury verdicts accompanied by praise of the procedure remains to be seen." Bland, 958 S.W.2d at 675 n.1. In the fourteen capital cases the Supreme Court has reviewed for proportionality since Bland, the string of affirmations remains unbroken by even a single reversal.[5] In reviewing a similar comparative proportionality review procedure in Connecticut, Justice Peters of the Connecticut Supreme Court stated that "the search for an [aberrant death sentence] is the pursuit of a chimera," and she concluded that defendants facing the death penalty did not "receive even a scintilla of protection from proportionality review." State v. Cobb, 743 A.2d 1, 133 (1999) (Peters, J., concurring). Because of the weaknesses inherent in Tennessee's comparative proportionality review procedure, the same could be said of comparative proportionality review in Tennessee.

IV

For the foregoing reasons, in my view, the majority's opinion fails to protect defendants from the arbitrary or disproportionate imposition of the death penalty. Although I agree that comparative proportionality review is essential to ensure that the death penalty is constitutionally applied, I am unconvinced that the current system adequately fulfills this purpose. Furthermore, while I agree that race must be considered a factor if comparative proportionality review is to be effective, the majority's cursory treatment of this issue fails to specify how proportionality analysis should be conducted in order to ensure that racial bias is eliminated from our capital sentencing system. Until these flaws are addressed and corrected, I cannot agree that the defendant's death sentence in this case has been fairly and proportionately imposed in keeping with the constitution. Therefore, although I concur in the majority's decision to affirm the defendant's conviction, I respectfully dissent from its decision to impose the death penalty in this case.

_____
ADOLPHO A. BIRCH, JR., JUSTICE

---

[5] See State v. Keough, 200 Tenn. LEXIS 171 (S. Ct. 2000); State v. Hall, 8 S.W.3d 593 (Tenn. 1999); State v. Middlebrooks, 995 S.W.2d 550 (Tenn. 1999); State v. Smith, 993 S.W.2d 6 (Tenn. 1999); State v. Burns, 979 S.W.2d 276 (Tenn. 1998); State v. Pike, 978 S.W.2d 904 (Tenn. 1998); State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998); State v. Hall, 976 S.W.2d 121 (Tenn. 1998); State v. Vann, 976 S.W.2d 93 (Tenn. 1998); State v. Blanton, 975 S.W.2d 269 (Tenn. 1998); State v. Cribbs, 967 S.W.2d 773 (Tenn. 1998); State v. Caruthern, 967 S.W.2d 726 (Tenn. 1998); State v. Hall, 958 S.W.2d 679 (Tenn. 1997); State v. Mann, 959 S.W.2d 503 (Tenn. 1997).