IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 20, 2001

## STATE OF TENNESSEE v. ROBERT EARL JOHNSON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 98-A-87     J. Randall Wyatt, Jr., Judge**

---

**No. M2000-01647-CCA-R3-CD - Filed October 8, 2001**

---

The defendant, Robert Earl Johnson, was convicted of first-degree murder and sentenced to life in prison without the possibility of parole. In this appeal, Defendant argues insufficiency of the evidence, improper investigative procedures by the police, errors by the trial court regarding admissibility of evidence and jury instructions, improper comments by the prosecutor during closing argument, sentencing errors, and ineffective assistance of counsel. After a review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID G. HAYES, J., and TERRY LAFFERTY, Sp.J., joined.

Larry B. Hoover, Nashville, Tennessee (on appeal); Karl Dean, District Public Defender; Wendy Tucker, Assistant Public Defender; and Jodie Bell, Assistant Public Defender, Nashville, Tennessee (at trial) for the appellant, Robert Earl Johnson.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Dan Hamm, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Robert Earl Johnson, and his brother, Roderick Johnson, were indicted for first-degree murder in connection with the killing of William Edwin Binkley on October 24, 1997. A Davidson County jury found Defendant guilty of first degree murder and his brother, the co-defendant at trial, guilty of second-degree murder. After a sentencing hearing, the jury found sufficient evidence of a statutory aggravating circumstance in Defendant's case, i.e., that "the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," see Tenn. Code Ann. § 39-13-204(i)(5), and sentenced him, accordingly, to life without the possibility of parole.

On appeal, Defendant specifically argues the following issues: (1) the evidence was insufficient to support his conviction; (2) the trial court erred by allowing the victim's hearsay statement into evidence at trial; (3) the trial court erred when it allowed a witness to testify in violation of Tenn. R. Evid. 615; (4) the trial court erred by allowing the prosecutor to make improper and prejudicial remarks during its closing argument; (5) the trial court erred by refusing Defendant's request to instruct the jury regarding the minimum mandatory length of a sentence for life imprisonment; (6) law enforcement authorities failed to adequately investigate Defendant's case; (7) the State failed to prove the existence of the statutory aggravating circumstance beyond a reasonable doubt; and (8) Defendant received ineffective assistance of counsel at trial.

## FACTUAL BACKGROUND

On the evening of October 24, 1997, William Edwin Binkley was attacked and stabbed forty-one times in his apartment on Whitsett Road in Nashville, Tennessee. The stabbings resulted from an altercation between the victim, Binkley, and two men who were observed both when they entered the victim's apartment and when they departed approximately one hour later. One of the suspects was subsequently identified as Defendant by two eyewitnesses present at the crime scene; the other was not positively identified by the eyewitnesses, but Defendant's brother, Roderick Johnson, was found guilty of second-degree murder as the other offender in the killing based on additional evidence presented at the trial. The case of Roderick Johnson is not before the Court in this appeal.

The altercation began shortly after Defendant and his brother knocked on the door of Binkley's apartment at approximately 9:00 p.m. and were admitted inside. Within a few minutes, some of the neighbors heard yelling and sounds of a struggle--like someone was being physically thrown and dragged about the apartment. The neighbor living in the apartment adjacent to Binkley's reported that he heard one of the perpetrators shout, "Where's my money? I want my money" and "I'm going to shoot you." The neighbor who lived in the apartment directly below the skirmish heard Binkley cry out, "Oh God, help me. They're killing me. Oh God, help me." The commotion continued for approximately one hour. At least three residents living in nearby apartments called 911 to report the melee, but they were unable to talk with anyone for at least twenty minutes. The neighbors who did finally make contact with the emergency dispatcher were informed that there were not enough police officers available to respond to their call.

Vickie Miller, one of the neighbors who became frustrated by her own futile attempts to secure police assistance, telephoned Binkley's mother, Frances Hampton, at work and told her to come home immediately "because someone was killing Willie [Binkley]." Hampton lived in the same apartment complex as her son. Arriving at home a few minutes later, she observed a crowd of residents gathered at the bottom of the stairs leading to her son's apartment. They cautioned her that the two men seen entering Binkley's apartment earlier had not come out yet. Notwithstanding the warning, Hampton marched up the stairs and banged the door to her son's apartment three or four times shouting, "Open the door. Open the door." She received no response.

Hampton had walked half-way back down the stairs when the door to Binkley's apartment suddenly flew open. Two African-American men emerged. The first was tall and slim; the second was shorter and heavier. Both men passed Hampton, who had remained standing on the stairs, and then pushed past the crowd which had gathered at the bottom. As the stockier man passed Hampton, he paused briefly. She noticed he was sweating profusely; he wiped his face with a cloth and threw it on the ground. Hampton "looked him right in the face" at this point. Although it was dark that night, Hampton claimed she was able to see the stockier man well enough to positively identify him later as the Defendant.

The two men headed immediately for the parking lot. Hampton called out for someone to get the license number of their car, and then ran up the stairs into her son's apartment. The interior was in great disarray, and Binkley was lying on the floor in a fetal position. His neck was cut and blood was everywhere, but he was still conscious and made the following statement to Hampton: "Momma, I didn't owe them any money. I didn't owe them any money." As the ambulance prepared to transport Binkley to Vanderbilt Hospital, the police officers began to arrive. Hampton followed the ambulance and her son to Vanderbilt Hospital where he died three days later, on October 27, 1997. The cause of death was determined to be the combined result of forty-one stab wounds to the head, neck, torso, and extremities; some of the wounds were superficial, but others, i.e., the wounds to the lung and liver, were termed "critical." The doctor who testified at trial regarding the cause of death further opined that more than one weapon was probably used to kill Binkley.

Derrick Shawn Barrett and his wife lived in the same apartment complex as Binkley. Just prior to the stabbing incident, at approximately 8:30 or 9:00 p.m., the Barretts were returning from a shopping trip when Mr. Barrett noticed an African-American infant asleep in a vehicle as they walked through the apartment parking lot. The baby was strapped into a child's car seat located on the back seat of the vehicle, the windows were down, and the vehicle was unattended. The Barretts were concerned for the baby's safety. Since they could see the parking lot from their apartment, they went home and kept a watch on the car from their window. After twenty or thirty minutes passed and no one came to check on the baby, Barrett wrote down the license plate number of the car, and Mrs. Barrett called 911 to report the possibility that someone may have abandoned a child. Approximately one hour after Barrett first noticed the infant, he observed two men walk hurriedly across the parking lot and get into the car with the baby in it. It was dark and he could not see their faces, but he was able to determine that they were African-American. Barrett described the taller man as extremely "hyper" and "on the move." The shorter, husky man seemed calmer and "in control." The husky man drove the vehicle; he backed up slowly, and then headed for the exit with the headlights off. When the men reached the road, the headlights came on and the vehicle began to accelerate. When the police arrived, Barrett gave them the license number of the car. Because Binkley's and Barrett's apartments were located in different buildings, Barrett heard none of the commotion that had occurred at Binkley's building.

At 10:15 p.m. that same evening, Brandy Stoops, another neighbor, left her apartment and walked toward the parking lot. Like the Barretts, Stoops' apartment was located too great a distance

from Binkley's apartment for her to hear any of the disturbance while at home. When she reached the parking lot, however, she heard numerous people shouting for an ambulance. At the same moment, she observed two African-American men pushing through a crowd of people, apparently in an attempt to reach a blue, four-door car parked in the parking lot. One man was thin, the other was husky, and she testified at trial that she could see the face of the husky one "clear as day" because he stared at her when they passed by. When the two men reached the car and the thin man hesitated, the husky one banged on the roof of the car shouting, "Come on, let's go, let's go," and then they both jumped into the vehicle. The husky man entered the driver's side and the men started to drive away with the headlights off, but turned them on when they reached the street. Days later, when Stoops discovered what had happened to Binkley, she told the police what she had witnessed and selected Defendant from a photographic lineup as the husky man she saw in the parking lot. Stoops said that she was unable to identify the thin man because the light was poor and his body was turned away from her; by contrast, she claimed her view of the husky suspect was much better. When asked at trial whether she was certain that Defendant was the husky man she observed in the parking lot, she answered affirmatively.

Officers from the Metro Police Department did not arrive at the crime scene until the Metro Fire Department was in the process of transporting Binkley to the hospital. (The actual time the police arrived was not given in the record.) The first police officer on the scene, Edward Westerman, commenced the investigation. Derrick Barrett gave him the license number of the vehicle which had contained the unattended baby and which he had also observed leaving the parking lot with its lights off. A registration check revealed the vehicle was owned by Roderick Johnson, Defendant's brother and co-defendant at trial. At approximately 11:15 p.m., Officer George Bouton, from the Identification Division, also arrived to recover and collect evidence  Officer Bouton took photographs of the blood stains located throughout Binkley's apartment and the broken furniture in each room. He also attempted to recover fingerprints, but was unable to obtain any that were identifiable. Bouton explained at trial that he did not process the white towel allegedly used by Defendant to wipe his face because no one informed him of its existence or potential relevance.

When Binkley died on October 27, 1997, the case officially became a homicide investigation and Detective Jeff West, assigned to the Homicide Division, was placed in charge. West first re-interviewed the witnesses who were at the crime scene the night of the killing, including Hampton, the victim's mother; the Barretts, who reported the license number of the suspicious vehicle; Stoops, the witness who saw the husky suspect "clear as day"; and the various neighbors who were situated at the bottom of the stairs when the two suspects exited Binkley's apartment. West was able to obtain consistent descriptions of the suspects, but he did not acquire any names as a result of these interviews.

Defendant became a suspect in the killing shortly after the police discovered that the vehicle observed by Barrett at the crime scene was registered to Defendant's brother, Roderick Johnson, and Roderick informed Detective West that he had met the victim through Defendant. The day after the police talked with Roderick, October 28, 1999, West showed the victim's mother, Hampton, a photographic lineup consisting of twelve photographs of African-American males: two groups of

six photographs each. Photographs of Defendant and his brother were included in the lineup but placed in different groups. Hampton identified Defendant as the man she saw coming out of her son's apartment, but did not recognize Roderick from his photograph. Later, Stoops similarly identified Defendant from an identical photographic array but similarly failed to recognize Roderick. The remainder of the witnesses who were present at the apartment complex during the stabbing failed to recognize either Defendant or Roderick from the photographs. Regarding photographic lineups in general, West testified at trial that it is the policy of the Metro Police Department to do whatever they can to ensure that the photographic lineups they use are not suggestive: the photographic arrays usually contain persons of the same race, age, build, hairstyle, et cetera. When asked at trial why the investigators did not conduct a physical lineup in Defendant's case, West replied that photographic lineups are quicker and easier to perform. West claimed that, for practical reasons, the police department has almost stopped using physical lineups altogether, and in the ten years he has been a detective, he has never used one.

On November 5, 1997, Detective West gave Officer Charles Ray Blackwood, assigned to the Identification Division, a screwdriver to process as evidence. The screwdriver was discovered by Binkley's mother, Hampton, approximately a week after the stabbing as she was straightening her son's apartment. It was jammed under a coffee table with only the tip visible. West and Blackwood discussed whether the screwdriver should be processed for blood or fingerprint evidence, and ultimately decided that blood evidence would be most helpful to the case. Since the screwdriver had been handled since the killing, the officers believed that tests for fingerprints would not be fruitful.

The next day, November 6, 1997, Officer Raymond Rader was assigned to process the vehicle belonging to Roderick Johnson which Barrett had observed leaving the crime scene after the stabbings. Officer Rader examined the interior for possible blood samples and took photographs of the vehicle, but he did not attempt to recover prints because he received no request from anyone to do so. On the driver's seat was a stain which appeared to be blood. Samples of material recovered from the seat of the vehicle and the screwdriver were sent to the Tennessee Bureau of Investigation's crime lab for analysis, which subsequently determined that both items contained human blood belonging to the victim, Binkley.

At trial, Defendant testified that he met the victim, Binkley, approximately a year prior to Binkley's death. At that time, Binkley and Defendant lived within a couple of blocks of each other and used drugs together (specifically, marijuana, cocaine, and alcohol). Defendant claimed that although he eventually quit using drugs, he maintained a friendship with Binkley to help him quit also. Defendant would also see Binkley frequently on his way to or from the local pay telephone. Because Defendant did not have a telephone in his home, he used the pay phone near Binkley's apartment to make calls and would stop by the apartment to visit him. Defendant testified that his brother, Roderick, also knew where Binkley lived.

Defendant fiurther testified that he often loaned Binkley money. For instance, in early October 1997, Defendant observed Binkley fighting with some people over a debt for cocaine that was given Binkley on credit. Defendant paid Binkley's debt to keep the drug dealers from harming

him. Later that same month, Binkley approached Defendant for more money. Binkley confessed that he had "smoked his money up," but said that he would be evicted from his apartment if he could not pay rent. Defendant initially refused to help him. However, he later relented and gave Binkley approximately forty-five dollars. Defendant testified that he never expected Binkley to pay him back for that favor, or any other "loan" for that matter.

Defendant testified that on the evening of October 23, 1997, the day prior to the stabbing, he bought himself something to drink at a local liquor store and then stopped by Binkley's apartment. Binkley and a friend of his named Joe were smoking cocaine and drinking beer, and Defendant drank for a while with them. When Binkley stepped into another room, Joe started rifling through Binkley's wallet. Defendant told him to stop it, but Joe became belligerent and Defendant left. Later, Defendant encountered Joe again and Joe hit him with his fist. Defendant hit Joe back with the bottle he was carrying, and headed for Binkley's apartment to make sure he was all right. Binkley was angry about something and accused Defendant of rummaging through his belongings. Defendant testified that he tried to explain that Joe was responsible but Binkley was too "high" to listen. Defendant left Binkley's apartment--that was the last time he saw him alive.

Defendant testified that the next day, October 24, 1997, the date of the stabbing, he had a fight with his wife before she went to work. Later that afternoon, Roderick asked him to come to their sister's house for dinner, but Defendant declined because he wanted to be at home when his wife returned from work. His wife arrived at home at approximately 9:00 or 9:30 p.m. Defendant fixed her dinner, and they stayed home for the rest of the evening. At trial, Defendant's wife corroborated Defendant's testimony, testifying that he was home when she arrived at 9:15 p.m. and did not leave until sometime the next morning.

According to Defendant, he first learned of the attack against Binkley on Monday, October 26, 1997. His brother's fiance erroneously informed him that Binkley had been shot and the police had tried to implicate Roderick. When Defendant arrived at home, his wife told him that the police wanted to talk to him also. He telephoned the police the next day and was arrested on Thursday, October 30, 1997, a few days later.

Defendant claimed that he voluntarily gave the police a statement because he had nothing to hide. Defendant wanted the police to investigate whether his sister's boyfriend, Baso Felder, was the man who was actually with his brother, Roderick, at Binkley's apartment. Defendant told the investigators that he and Felder were similar in appearance and Felder was frequently seen with Roderick. However, when Hampton was shown a photograph of Felder at trial, she denied that he was the man she saw coming out of her son's apartment. In addition, Defendant's sister, Tammy Denise Chatman, testified that Felder and Roderick were at home with her on October 24, 1997, from approximately 6:00 p.m. until after midnight. At trial, Roderick also claimed to be at his sister's home on the evening of October 24 and admitted to having no explanation for how his car could have been simultaneously observed at Binkley's apartment. Roderick admitted that he was caring for his fiance's fifteen-month-old daughter that night and that he often traveled with a baby's car seat in his vehicle.

Hampton testified that on October 25th or 26th, a day or two before Binkley died, she was riding in the hospital elevator on her way to see her son when the door opened and Defendant was standing there, waiting to get on the elevator. They looked at each other for a moment, then Defendant turned away and quickly disappeared down a stair well. This upset Hampton. She reported the sighting to a doctor, but he assured her that the man she had observed was an employee and that her son was safe on the hospital's "security floor." Hampton testified that since she had numerous other things to worry about at the time, she did not report the incident to the police. It was a day or two later, on October 28th, that Hampton identified Defendant from photographic lineups. However, she testified that her identification of Defendant was based on a comparison of the man in the photograph with the man who emerged from her son's apartment, and not the man at the hospital. Contrary to Hampton's testimony, Defendant testified that he did not recall ever seeing Binkley's mother at Vanderbilt and, at that time, he did not know Binkley was being treated there.

## ANALYSIS

### I. Sufficiency of the Evidence

Defendant contends that the evidence adduced at trial is insufficient to sustain his conviction. Specifically, Defendant asserts that the evidence against him is largely circumstantial in nature and that the only direct evidence presented by the State at trial, namely, the testimony of the two eyewitnesses, is fraught with evidentiary problems. In sum, Defendant argues that because the circumstantial evidence, standing alone, is insufficient to convict him and the eyewitness testimony is fatally unreliable, the jury's verdict cannot stand. We disagree.

When evidentiary sufficiency is questioned on appeal, the standard of review is whether, after considering all the evidence in the light most favorable to the State, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 318-319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); Tenn. R. App. P. 13(e). In determining the sufficiency of the evidence, we will not reweigh the evidence or substitute our own inferences for those drawn by the trier of fact. State v. Pierce, 23 S.W.3d 289, 293 (Tenn. 2000); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn.1978). Instead, on appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. Hall, 8 S.W.3d at 599. A guilty verdict by a jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory, effectively removing the presumption of innocence and replacing it with a presumption of guilt. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions concerning the credibility of witnesses, the weight and value of evidence, and factual issues raised by the evidence are matters to be resolved by the trier of fact, not this Court. Pierce, 23 S.W.3d at 293; Bland, 958 S.W.2d at 659. The defendant bears the burden of demonstrating that the evidence is insufficient to support his or her conviction. State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As relevant here, first degree murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202 (1997). After reviewing the facts in the light most favorable to the State, we find that the evidence is sufficient to support Defendant's conviction. The proof shows that Defendant knew the victim, Binkley, and where he lived. Binkley's mother observed Defendant leaving Binkley's apartment with another man only minutes before she discovered Binkley's wounded and bloody body therein. Minutes later, another eyewitness saw Defendant and an unidentified man leaving the crime scene in a vehicle which was registered to Defendant's brother. Binkley's blood was later discovered on the driver's seat of that vehicle. Lastly, although five persons gave police general physical descriptions of the two suspects but were unable to positively identify either man from a photographic lineup, all five descriptions were consistent with each other and also matched the physical characteristics of Defendant and his brother.

Defendant maintains that the evidence used to prove his guilt was largely circumstantial. Even so, a crime may be proven wholly by circumstantial evidence. Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973). Our review of the facts is the same whether the finding of guilt is based on direct or circumstantial evidence. State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1997). Defendant's principal challenge actually concerns the direct evidence presented by the State at trial: the testimony of two eyewitnesses. Defendant argues that the eyewitnesses' testimony must be disregarded as unreliable because, among other things, the photographic lineups from which the eyewitnesses selected Defendant as the man they observed on October 24, 1997 were not prepared properly. Defendant further contends that, even if the lineups were reliable, the identification by the victim's mother cannot withstand scrutiny under the factors set forth in State v. Dyle, 899 S.W.2d 607 (Tenn. 1995). As a preliminary matter, we note that it is unclear from Defendant's brief whether he is arguing that the photographic identifications are *inadmissible* because improper preparation caused them to be unnecessarily suggestive, or that the "unreliable" identification evidence was given *improper weight* by the jurors when they apparently chose not to disregard it. In addition to classifying the photographic identifications as unreliable, Defendant also describes them as "tainted," "faulty," and "unable to withstand scrutiny" which seems to insinuate inadmissibility. Issues concerning admissibility are usually and properly raised in a pre-trial motion to suppress. Notwithstanding this ambiguity, Defendant is not entitled to relief because, for the reasons following, we find the photographic identifications are admissible and the proper weight to be given this evidence is a matter for the jury to determine, not this Court.

To recount, the two eyewitnesses in this case are Hampton, the victim's mother who identified Defendant as the man she saw leaving her son's apartment, and Stoops, the neighbor who observed Defendant get into his brother's vehicle and drive away. Defendant maintains that both eyewitness identifications should be disregarded as unreliable for two reasons: (1) the photographic lineups failed to contain a photograph of Baso Felder, the man Defendant alleges may have accompanied his brother on the night of the stabbing, and (2) the lineups failed to contain photographs of other African-American males who frequented the neighborhood surrounding Binkley's apartment.

Photographs contained in a photographic lineup are not required to mirror the accused. State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998). The law requires merely that the police refrain from unnecessarily suggestive identification procedures. See Neil v. Biggers, 409 U.S. 188, 198-99, 93 S.Ct. 375, 381-82, 34 L.Ed.2d 401 (1972). Thus, "a photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.'" Hall, 976 S.W.2d at 153 (quoting Stovall v. Denno, 388 U.S. 293, 301-302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967)).

According to the record, Detective West testified that the procedure used by the officers to select photographs for the lineup in this case was, as is the practice with all lineups, not weighted for or against any particular person. Further, the police officers in charge of the investigation did everything practicable to ensure that the identification was free from suggestion on their part, e.g., the photographs were of men who were similar with respect to age, build, and hairstyle. We note that although a photograph of Baso Felder was allegedly not included in the photographic lineup, the record shows that Hampton had the opportunity to view a photograph of Felder in court at which point she testified that Felder was not the man who came out of her son's apartment. Thus, it appears that the presence of Felder's photograph in the lineup would have been immaterial, and its absence cannot be said to have prejudiced Defendant. Since Defendant did not provide this Court with either a photograph of Felder or a copy of the photographic array he contends was unreliable, we are unable to consider this specific matter further. As a result, we conclude that the photographic identification was not so unnecessarily suggestive and conducive to irreparable mistaken identification that Defendant was denied due process of law and, therefore, the identifications from the lineup were properly admissible for consideration by the jury.

Defendant also claims that, even if the photographic lineups were reliable, the testimony of Hampton cannot withstand scrutiny when considered under the factors used in evaluating eyewitness testimony set forth in State v. Dyle, 899 S.W.2d 607 (Tenn. 1995). He maintains that because it was dark and Hampton was distraught, her state of mind was such that she did not have the "capacity and opportunity" to adequately see Defendant for purposes of reliable identification as required by law.

Defendant's reliance on Dyle is misplaced. In Dyle, the supreme court promulgated jury instructions to be given in cases where a witness' identification of the defendant is a material issue and the defendant requests the instruction. See id. at 612 (the court outlined four factors to be used by the jury in considering witness identification testimony). In effect, Defendant is arguing that the jury did not properly follow the instructions given by the trial judge concerning witness identification and this caused it to give Hampton's unreliable identification excessive weight. Defendant's argument is based on pure speculation, however. Our review has revealed no proof in the record that the jury committed any error in arriving at its verdict, and Defendant's brief fails to cite to any. The proper weight to give Hampton's testimony turns on her credibility, and questions concerning the credibility of witnesses, the weight and value of evidence, and factual issues raised by the evidence are matters for the jury, not this Court. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). We may presume that the jury observed the witnesses at trial and evaluated their credibility. This Court

will not reweigh evidence or substitute our inferences for those drawn by the jury. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Furthermore, the record reveals that the jury received proper instructions as promulgated in Dyle concerning witness testimony. Since a jury is presumed to follow the instructions given by the trial judge, State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998), we may infer by its verdict that the jury rejected Defendant's account of his activities on October 24, 1997, and accredited the testimony of the State's eyewitnesses. In a similar vein, we may further infer that the jury rejected the testimony of Defendant's wife, the basis for Defendant's alibi defense. See Forbes v. State, 559 S.W.2d 318, 324 (Tenn. 1977) (credibility of alibi witnesses and the weight to be given their testimony are determined exclusively by the jury).

Defendant contends that Stoop's identification was also unreliable. Essentially, Defendant claims that Stoops was familiar with his face because he frequented the apartment complex and because she saw him regularly as he walked by the apartment building to use the pay telephone located nearby. Defendant submits that because she could not see clearly in the dark conditions that existed that evening, she subconsciously based her identification on a familiarity with his face, rather than an observation of him in the parking lot. However, this argument involves a determination regarding Stoops' credibility which, as noted above, is the sole province of the jury. Bland, 958 S.W.2d at 659.

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. Cabbage, 571 S.W.2d at 835. Accordingly, after a thorough review of the record and the arguments presented, we find the evidence sufficient to sustain Defendant's conviction. Defendant is not entitled to relief on this issue.

## II. Admissibility of Victim's Hearsay Statement

Defendant contends the trial court erred by allowing the victim's inadmissible hearsay statement into evidence at trial. Defendant asserts that the statement did not qualify as either a dying declaration, Tenn. R. Evid. 804(b)(2), or an excited utterance, Tenn. R. Evid. 803(2). Defendant further argues that, given the emotional impact of the statement and the tenuousness of the State's case against Defendant, the trial court's error cannot be deemed harmless and, thus, his conviction must be reversed and dismissed. We disagree.

Tennessee Rule of Evidence 804(b)(2) provides the circumstances that allow for the hearsay rule exception known as a dying declaration: "In a prosecution for homicide, a statement made by the victim while believing that the declarant's death was imminent and concerning the cause or circumstances of what the declarant believed to be impending death."

This Court has previously held that it is not necessary that the declarant state unequivocally a belief that death is imminent. State v. Maruja Paquita Coleman, No. 01C01-9401-CR-00029, 1997 WL 438169 at **5, Davidson County (Tenn. Crim. App., Nashville, July 31, 1997) perm. to app. denied (Tenn. April 1998). "Awareness of impending death has been inferred from the language and condition of the declarant, the facts and circumstances surrounding the statement, and medical

-10-

testimony concerning the seriousness of the victim's condition." Id. (citations omitted). Importantly, it is not necessary that the victim die shortly after making the statement to qualify for the hearsay exception as a dying declaration if the requirements of the rule are satisfied. Id.

There are four preliminary facts that must be proven prior to admitting a hearsay statement under the exception for a dying declaration: (1) the declarant must be dead, (2) the statement must be admitted only in a homicide prosecution in which the declarant is the victim, (3) the statement must concern the cause or circumstances of death, and (4) the declarant must have spoken or written the statement under the belief that death was imminent. See Neil P. Cohen, et al., Tennessee Law of Evidence, § 835[2] (4th ed. 2000). The last provides the indicia of reliability and truth that justifies admission of the statement. Id. The burden is on the proponent of the hearsay statement to justify its admission as an exception to the hearsay rule of exclusion by proving the existence of the preliminary facts by a preponderance of the evidence. See State v. Stamper, 863 S.W.2d 404, 405 (Tenn. 1993). If the trial court finds that it is more probable than not that the preliminary facts exist, the evidence is admissible.

In the case sub judice, the record reveals that the trial court allowed Hampton to testify that Binkley made the following statement as he lay bleeding on the floor of his apartment: "Momma, I didn't owe them any money. I didn't owe them any money." This statement was allegedly uttered only minutes after the stabbing occurred, and Binkley died three days later.

During the pre-trial hearing on Defendant's motion to suppress this statement, the trial court ruled that the statement was admissible under the dying declaration exception in Tennessee Evidence Rule 804(b)(2). As a basis for its ruling, the trial court specifically found that the statement was made by the declarant, that is, the victim, who was deceased at the time of the hearing; that the case involved prosecution for a homicide; that the statement concerned the circumstances of the death; and that the declarant made the statement while believing that his death was imminent. The trial court observed that the analysis in State v. Maruja Paquita Coleman, No. 01C01-9401-CR-00029, 1997 WL 438169, Davidson County (Tenn. Crim. App., Nashville, July 31, 1997), applied in this case and provided the standard for admissibility under this exception. The trial court further found that the declarant was conscious of the peril of his situation and believed that death was impending. The trial court noted that, according to case law, the victim is not required to explicitly state that he or she believes death is imminent to have this exception apply. Specifically, the trial court found the medical examiner's report, indicating that the victim suffered from multiple stab wounds to the head, torso, extremities, lung, liver, diaphragm, kidney, and other organs, confirmed that the victim's condition was sufficiently serious at the time of his statement to permit an inference that he was aware of his impending death.

During appellate review, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of witness credibility, the weight and value of evidence, and resolution of conflicts in the evidence are entrusted to the trial court as the trier of fact. Id. The prevailing party in the suppression hearing is entitled on appeal to the "strongest legitimate view of the evidence at the

hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Id.

Defendant argues that, under State v. Hampton, 24 S.W.3d 823 (Tenn. Crim. App. 2000), in order for a statement to qualify as a dying declaration, the declarant must have "had a certain belief that rapid death was inevitable." Yet, a close reading of our decision in Hampton reveals that this was not our holding, but a quote from one of a number of treatises examined during the course of our analysis. See id. at 829. Moreover, "rapidly" is a highly subjective determination and, possibly for this reason, this word was not used in the rule providing this hearsay exception. The law requires only that the declarant believed death was "imminent"; proof that the dying declarant believed that death would come within a specified number of hours or minutes is not reasonable. One authority states that the rationale for this exception is that one facing imminent death will be truthful for fear of "eternal consequences." See Neil P. Cohen, et al., Tennessee Law of Evidence, § 835[2] (4th ed. 2000). Clearly, the declarant's *belief* is the crucial factor. As previously observed, the fact that a victim does not actually die shortly thereafter does not preclude its admission as a dying declaration if the other requirements of the rule are satisfied. Coleman, 1997 WL 438169 at **5.

Although Defendant concedes that Binkley was "badly injured," he asserts that the State presented absolutely no proof that Binkley had the requisite belief in his own imminent death. We disagree. According to the medical report, the cause of death was determined to be the combined result of forty-one stab wounds to the head, neck, torso, and extremities; some of the wounds were superficial, but others, i.e., the wounds to the lung and liver, were "critical." The testimony of the neighbors indicated that Binkley was attacked for almost an hour before the suspects departed. By the time the commotion ended and his mother rushed to his side, Binkley's blood was everywhere. Given the facts, Binkley's belief that his death was imminent can be readily inferred. Since the evidence supports the trial court's conclusion that the victim was aware of his impending death at the time he made the statement to his mother, we cannot say that the evidence preponderates against the trial court's conclusion that Binkley's statement was a dying declaration. Hence, it was admissible under the hearsay exception for dying declaration, Tenn. R. Evid. 804(b)(2), and the trial court did not err. Defendant is not entitled to relief on this issue.

Because we have determined the victim's statement is admissible for the reasons above, it is unnecessary to address Defendant's argument against admissibility under the hearsay exception for excited utterances, Tenn. R. Evid. 803(2). Even if admission of the victim's hearsay statement was error, Defendant's argument that it cannot be harmless "given the emotional impact of the statement and the tenuousness of the State's case" against Defendant has no merit. Defendant's brief contains no argument or citation to authority in support of his assertion that the statement affected the result of his trial. In addition, proof of Defendant's guilt was not "tenuous," as he has asserted. Defendant is not entitled to relief on this issue.

### III. Tennessee Evidence Rule 615

Defendant contends that the trial court erred by allowing a witness to testify in violation of Tennessee Evidence Rule 615. The record reflects that the trial court permitted the co-defendant, Roderick Johnson, to recall the victim's mother, Hampton, to testify after her initial testimony during the State's case-in-chief against Defendant. Defendant claims that because Hampton had been present in the courtroom since her initial testimony, Tennessee Evidence Rule 615 precluded her from being recalled.

This issue was not included in Defendant's motion for new trial. Accordingly, Defendant's allegation of error may be waived under Rule 3(e) of Tennessee's Rules of Appellate Procedure, State v. Walker, 910 S.W.2d 381, 386 (Tenn. 1995), unless the issue would result in the dismissal of the prosecution against the accused if found meritorious. State v. Keel, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994). The nature of this issue requires it to be included in the motion for new trial.

Notwithstanding waiver, Defendant would still not be entitled to relief on this issue. The record reveals that during a jury-out hearing at the close of Defendant's proof, the trial court heard argument concerning this issue from counsel for the co-defendant, Roderick, and counsel for Defendant. Roderick wanted to recall Hampton to testify regarding whether she recognized the man in the photograph of Baso Felder as the same man who exited her son's apartment the night of the stabbing. Defendant's counsel objected on the ground that allowing her testimony would violate Rule 615 of Tennessee's Rules of Evidence, "Exclusion of witnesses." Commonly referred to as "the rule," Rule 615 requires the court to order witnesses, including rebuttal witnesses, excluded at trial upon request of either party until after the witness has testified at trial and forbids disclosure of live testimony to the excluded witnesses by any means. However, the rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised by the need for the unsequestered witness's testimony and demonstrates such need to the satisfaction of the trial court. The rule is activated by request for sequestration by a party, and the record shows that Defendant filed the proper motion requesting that witnesses be sequestered.

At the conclusion of the jury-out hearing, the trial court permitted the co-defendant to recall Hampton to testify, but limited her testimony to answering one question: whether she recognized the man in the photograph of Baso Felder. The trial court stated that admitting Hampton's answer did not thwart the purpose of the rule, which is "to keep witnesses from sitting in the courtroom, listening to witnesses that are going before them and then shape their testimony to conform to that," and further noted that "[t]he underlying purpose of a trial is to try to reach the truth."

After the jury returned, the following colloquy transpired:

Roderick's Counsel: I'd direct your attention to the photograph that appears on that document. You have previously testified that you identified in a photo spread the photograph of Mr. Robert Johnson [Defendant] as the person that you spoke to as coming down the steps [of your son's apartment]; is that correct?

Hampton: Yes, sir.

Roderick's Counsel: I would like for you to look at the photograph that you have before you. And I'd like to ask you if you were mistaken and, indeed, the person that you saw coming down the steps was that individual or you still feel that looking at that photograph, and looking at Mr. Robert Johnson, that is Mr. Johnson or is that --

Hampton:   It's Mr. Johnson.

Roderick's Counsel: Thank you.

Clearly, the brief testimony of Hampton did little more than reaffirm her identification of Defendant as the man who emerged from the victim's apartment immediately prior to the discovery of her son's bloody body on the floor therein. Even if the trial court's decision to allow the testimony was error, it would not require dismissal of the charges against Defendant and, therefore waiver is appropriate. Tenn. R. App. P. 3(e); see Keel, 882 S.W.2d at 416.

Further, the trial court did not abuse its discretion in this matter. The rule does not forbid testimony of a witness called at the rebuttal stage if, in the court's discretion, counsel is genuinely surprised by the need for the unsequestered witness's testimony and demonstrates such need. According to the record, the photograph was initially admitted into evidence during Defendant's testimony in his case-in-chief earlier that same day. Therefore, a finding of surprise is consistent with the facts, and need was established when Defendant suggested that Roderick Johnson committed the murder with his friend, Baso Felder, instead of himself. Defendant is not entitled to relief on this issue.

## IV. The Prosecutor's Closing Argument

Defendant next complains that the trial court erred by allowing the prosecutor to make improper and prejudicial remarks during its closing argument. Specifically, Defendant claims that the prosecutor's comments suggested to the jury that they must convict Defendant to prevent the "system" from failing the victim one more time. Defendant contends that the prosecutor's remarks interjected extraneous and illegitimate considerations into the jury's decision-making and the trial court should have interceded, notwithstanding the failure of Defendant to object.

In this case, the comment in issue appeared in the following context during the State's closing argument:

We know through the testimony of one of the defendants that [the victim] did drugs. And I guess one could say, well, maybe he ought to know since he said, "I used drugs with him." And he may have used drugs, ladies and gentlemen. We don't know. And quite frankly, it shouldn't matter. Now you know, I say that and you kind of look at me and probably think, well, what do you mean, it shouldn't matter. Of

-14-

course it matters if people use drugs, but it shouldn't matter in this particular case whether or not you look at [the victim's] death differently. And I would ask you not to look at his death differently than if it said he worked seven years at the same restaurant, but I don't believe he ever used drugs a day in his life. If anyone here, at the conclusion of this case believes that somehow or another William Binkley got what he deserved on October 24th, 1997, then, certainly, this system has failed William Binkley one more time.

To preserve this issue for appeal, Defendant should have objected to the prosecutor's remarks at trial. Because he failed to do so, this issue may be waived under Rule 36(a) of Tennessee's Rules of Appellate Procedure. Nevertheless, we shall address Defendant's contention that the jury was unduly influenced by the State's "extremely powerful" and "blatantly improper" argument.

In general, closing argument is subject to the trial court's discretion. Counsel for both prosecution and defense are generally permitted wide latitude in arguing their cases to the jury. State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994). Argument must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law. State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994). The prosecutor must refrain from argument designed to inflame the jury and should restrict its commentary to matters properly in evidence at trial. Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995).

The State argues that the prosecutor's comment was intended merely to defuse any possible prejudice that the jurors might have against the victim based on his drug use. After a careful reading of the prosecutor's closing argument, we agree that this is a reasonable interpretation and find that the prosecutor's statement did not exceed the proper bounds of argument when it submitted to the jury that it should not base its verdict on a finding that the victim "got what he deserved" because of his drug usage. There was proof that the police department failed to properly respond to the 911 calls. We see nothing improper in the manner with which the prosecutor linked these facts. Therefore, notwithstanding waiver, Defendant is not entitled to relief on this issue.

## V. Jury Instruction Concerning Length of Sentence

Defendant also argues that the trial court erred by refusing Defendant's request to instruct the jury regarding the minimum mandatory length of a sentence for life imprisonment at the guilt/innocence phase of his trial. Defendant concedes that his request is prohibited by the recent amendment to Tennessee Code Annotated section 40-35-201(b), effective July 1, 2000, but argues that the current version of the statute is unconstitutional and, therefore, the trial court erred by relying upon it in refusing Defendant's request.

We are unable to locate Defendant's request for this jury instruction in the record. In its brief, the State admits to a similar inability to locate the request. It is the duty of the defendant to include accurate and appropriate references to the record when submitting issues for appellate review. See Tenn. R. App. P. 27(g). Failure to include appropriate references to the record may

result in waiver of such issues. See State v. Killebrew, 760 S.W.2d 228, 230-31 (Tenn. Crim. App. 1988). Notwithstanding the omission, we shall briefly address Defendant's issue.

The statute controlling jury instructions in matters of sentencing such as this is Tennessee Code Annotated section 40-35-201. On May 1, 1998, Tennessee's General Assembly passed Public Chapter No. 1041, an amendment to then-existing Tennessee Code Annotated section 40-35-201, which deleted subsection (b) in its entirety and substituted the following:

> In all contested criminal cases, except for capital crimes which are governed by the procedures contained in [Tennessee Code Annotated] §§ 39-13-204 and 39-13-205, and as necessary to comply with the Constitution of Tennessee, article VI, section 14, [Tennessee Code Annotated] § 40-35-301, *the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged* nor all lesser included offenses.

Tenn. Code Ann. § 40-35-201 (Supp. 2000) (emphasis added). By contrast, the statutory provision in effect prior to Defendant's trial allowed the jury to "weigh and consider the meaning of a sentence of imprisonment for the offense charged," which included "an approximate calculation of the minimum number of years a person sentenced to imprisonment . . . must serve before reaching such person's earliest release eligibility date." See Tenn. Code Ann. § 40-35-201(b) (1997) (amended by Acts 1998, ch. 1041, § 2; applies to all trials occurring after May 18, 1998).

Apparently, Defendant's request would have been proper under the old statute section. He argues that the new statute denies him due process of law, and cites State v. King, 973 S.W.2d 586 (Tenn. 1998) to support this argument. In King, our supreme court held the statute in effect prior to the 1998 amendment passed constitutional muster. Specifically, the supreme court stated:

> As a matter of policy, the legislature has decided that the sentencing information is relevant because jurors are better off having concrete information on these issues rather than being left to speculate on their own. The rationale for permitting an instruction on the range of punishment, even though the jury does not impose the sentence, is that in reality, "jurors will consider punishment anyway and without direction may speculate to the possible detriment of a defendant. If nothing else, the instruction impresses upon the jurors the consequences of a guilty verdict."

Id. at 592 (quoting David Raybin, Criminal Practice and Procedure § 30.73 (1985)).

Of course the supreme court's reasoning in King is persuasive. However, this statute is no longer controlling on this issue. Moreover, the supreme court's conclusion that the repealed statute passed constitutional muster does not establish that the current statute fails to do so. The record reflects that, at the conclusion of the guilt/innocence phase of Defendant's trial, the trial judge instructed the jury that a guilty verdict would require them to determine the sentence at a separate hearing and not to consider punishment for the offense at that time. Later, at the sentencing hearing,

the trial judge instructed the jury that a sentence of life without the possibility of parole requires a defendant to serve a minimum of fifty-one (51) calendar years before he is eligible for release. These instructions comply with the current applicable statutory mandates for first degree murder. See Tenn. Code Ann. §§ 39-13-204, 40-35-501(h)-(i) (Supp. 2000) (section 40-35-501(i)(1) specifies a minimum incarceration of 51 years for first degree murder (85 percent of 60 years)). Since Defendant's brief contains no facts or legal authority to support his challenge to the statute's constitutionality, and he has failed to show that he at least requested the jury instruction, we are unpersuaded that the trial court erred. Defendant is not entitled to relief on this issue.

## VI. Law Enforcement's Investigation of Defendant's Case

Defendant contends that the police officers and the district attorney's office failed to conduct a reasonable investigation of his case and that, but for this failure, he would not have been convicted. Specifically, Defendant asserts that the authorities in charge of investigating Binkley's murder failed to discover important evidence, failed to properly test evidence they did discover, and failed to conduct themselves properly during witness identification procedures.

It is not the duty of this Court to pass judgment regarding the investigative techniques used by law enforcement unless they violate specific statutory or constitutional mandates. Appeals to this Court are based on allegations of errors committed by the trial court, the prosecutor's office, or the assistance of defense counsel, where such errors prevented a fair trial or affected the substantial rights of the accused which resulted in the accused's conviction. See Tenn. R. App. P. 3(b), 13; Tenn. R. Crim. P 37(b).

Defendant appears to be chagrined by the fact that alternate suspects were not discovered during the police investigation of Binkley's killing. He argues that the police and the district attorney have a duty to reasonably and properly investigate a case, including all reasonable suspects. However, Defendant's brief cites nothing in the record which provides proof that the police failed to discover any evidence (except a screwdriver which was subsequently found wedged underneath a coffee table), or that they blundered any testing procedures, or that they neglected to investigate any reasonable suspect. Moreover, the only citation Defendant provides in support of his argument is People v. Williams, 588 N.E.2d 983, 1016 (Ill. 1991) (no abuse of discretion on the part of the State's attorney where the exculpatory information allegedly ignored by the State was apparently known to even the media prior to defendant's trial, yet witness testimony indicated that it was never considered worthy of pursuit, even by the defense), which is not controlling authority in this Court.

Nevertheless, we reviewed each of Defendant's assignments of police bias and negligence and find nothing of merit or that amounted to more than exercises of discretionary judgment, typical of those which the police must perform every day. Here, Defendant was convicted for first degree murder based on the evidence presented at trial. We have determined this evidence is sufficient to sustain a guilty verdict. We further note that, because the record reveals that Defendant's allegations of police negligence were presented to the jury through the testimony of various witnesses, we may assume the jury considered the possibility of police misconduct, but discounted the theory when it

convicted Defendant. In sum, since Defendant has presented no evidence of errors which would have affected the result of his trial on the merits, and the record contains no proof that Defendant's substantial rights were affected, Defendant is not entitled to relief on this issue.

## VII. Proof of Statutory Aggravating Circumstance

Defendant argues that his sentence of life without the possibility of parole must be reversed because the State failed to prove that the murder involved "torture" or "serious physical abuse" beyond a reasonable doubt, proof of which was a prerequisite to imposing Defendant's sentence in this case. More specifically, Defendant contends that a finding of "torture" or "serious physical abuse" beyond that necessary to produce death must be analyzed separately under State v. Odom, 928 S.W.2d 18 (Tenn. 1996). Concerning "torture," Defendant asserts that although Binkley was heard screaming for his life at the beginning of the incident, the State failed to prove that he was conscious for the entire hour he was attacked. It follows that if Binkley was not fully conscious for the entire episode, he was also unable to feel sufficient pain to constitute "torture" for purposes of applying aggravating factor (i)(5). With regard to "serious physical abuse," Defendant further contends that because the medical examiner was unable to conclude that any *one* of the wounds, standing alone, could have caused death, forty-one stabbings constituted the minimum necesssary to consummate the killing and the attack did not involve serious abuse *beyond* that necessary to produce death. The State asserts that the record reveals otherwise. We agree with the State.

According to the record, on February 20, 1998, the State filed timely notice that it intended to ask for a sentence of imprisonment for life without possibility of parole in the event Defendant was convicted of first degree murder. See Tenn. Code Ann. § 39-13-208 (1997). A sentence of life without the possibility of parole can be imposed only upon a unanimous finding by the jury that the State has proven beyond a reasonable doubt the existence of one or more of the statutory aggravating circumstances enumerated in the first degree murder sentencing statute. See Tenn. Code Ann. § 39-13-204(i) (1997). In the case sub judice, the State relied upon the evidence presented during the guilt phase of trial to prove that the murder involved torture or serious physical abuse sufficient to apply aggravating circumstance (i)(5), i.e., that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5) (1997). Following a separate sentencing hearing, the jury determined that the State had proven the existence of statutory aggravating circumstance (i)(5) beyond a reasonable doubt and sentenced Defendant accordingly to life without the possibility of parole.

In State v. Odom, the supreme court discussed the aggravating circumstance used in Defendant's case and determined, among other things, that "torture" had been defined as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." Id. at 26 (citing State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985). The court also found that when the legislature added the words "or serious physical abuse," to the language, it intended "serious physical abuse" to be distinct from "torture." See id. The court determined that the word "serious" referred to degree of abuse; that the abuse must be physical, as opposed to mental; and that "abuse" is properly defined as an "excessive" act, or one which makes "improper

-18-

use of a thing," or which uses a thing "in a manner contrary to the natural or legal rules for its use." Id. (citing Black's Law Dictionary 11 (6th ed. 1990)).

After considering the above definitions and the facts in this case, we concur with the jury's finding that such evidence was proved beyond a reasonable doubt. Numerous witnesses at trial testified that they heard both the victim and his attackers yelling and that the commotion lasted for approximately one hour. The neighbors heard sounds as though people and furniture were being thrown about the apartment, and one neighbor testified that the victim "was almost thrown through the wall, numerous times." This evidence is sufficient for a jury to find that infliction of severe physical or mental pain upon the victim occurred while he was alive and conscious; in other words, that Binkley was "tortured" before he died. See State v. Blanton, 975 S.W.2d 269 (Tenn. 1998) (medical evidence that the victim may have remained alive for fifteen minutes during the attack or after receiving wounds was sufficient to support a finding of "torture" for purposes of applying subsection (i)(5)). Add to this the fact that the victim was stabbed forty-one times, and "serious physical abuse" is likewise evident.

When a defendant appeals a sentence of imprisonment without possibility of parole, this Court first considers any errors assigned and then reviews the appropriateness of the sentence. Tenn. Code Ann. § 39-13-207(g) (1997). In recognition of the substantial discretion afforded jurors in determining which sentence to impose, the statute governing appellate review declares that a sentence of life in prison without possibility of parole shall be considered appropriate if the State proved beyond a reasonable doubt at least one statutory aggravating circumstance contained in section 39-13-204(i), and the sentence was not otherwise imposed arbitrarily so as to constitute a gross abuse of the jury's discretion. Id.

Here, the record reveals that the trial court correctly instructed the jury as to the terms "heinous," "atrocious," and "cruel" as defined in State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985). The trial judge also correctly instructed the jury that "torture" means "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." Id. at 529. For the reasons above, the evidence is sufficient to support a finding that the statutory circumstance in section 39-13-204(i)(5) existed beyond a reasonable doubt. See Blanton, 975 S.W.2d at 281 (the torture prong of (i)(5) merely requires a jury finding that the victim remained conscious and sustained severe physical or mental pain and suffering between the infliction of the wounds and the time of death). Since the jury was given the proper instructions and we do not find a gross abuse of discretion on their part, we also find Defendant's sentence is appropriate. Defendant is not entitled to relief on this issue.

## VIII. Ineffective Assistance of Counsel

Lastly, Defendant contends that the representation of his counsel at trial was constitutionally deficient. His allegation of reversible error is three-fold. First, Defendant contends that trial counsel

was ineffective for failing to videotape the parking lot for purposes of demonstrating the dark conditions at the crime scene. He claims that this evidence was critical to his case for the purpose of casting doubt on the testimony of the eyewitnesses who placed him at the crime scene. Secondly, Defendant claims that trial counsel was ineffective for failing to individually voir dire the jurors because this was crucial to eliminating jurors who harbored racial prejudices. (The victim in Defendant's case was Caucasian.) Lastly, Defendant argues that trial counsel was ineffective for failing to adequately cross-examine the victim's mother, Hampton, concerning inconsistencies in her testimony. Defendant claims that Hampton's failure to mention at the preliminary hearing that she saw Defendant at Vanderbilt Hospital, in light of her testimony regarding this observation at trial, revealed an inconsistency which demanded exploration in the presence of the jury at trial.

In State v. Burns our supreme court held that a claim of ineffective assistance of counsel raised on direct appeal is a mixed question of law and fact and, thus, is subject to a de novo review. State v. Burns, 6 S.W.3d 453, 461 (Tenn.1999); Fields v. State, 40 S.W.3d 450 (Tenn. 2001). The de novo review of a trial court's factual findings by an appellate court are entitled to a presumption of correctness, which is overcome only when the preponderance of the evidence is contrary to the trial court's findings of fact. Fields, 40 S.W.3d at 458; Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). By contrast, when reviewing the trial court's application of law to its factual findings "to determine whether counsel's performance was deficient or whether the defendant was prejudiced by that deficiency, appellate courts conduct a purely de novo review, according to the trial court's conclusions of law no deference or presumption of correctness." Fields, 40 S.W.3d at 458.

A defendant alleging ineffective assistance of counsel must prove the allegations of fact underlying his claim by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f) (1997); Fields, 40 S.W.3d at 458. This standard of proof is required regardless of whether a petitioner is bringing the claim in a direct appeal or a post-conviction petition. See Burns, 6 S.W.3d at 461 n.5.

To determine whether counsel provided effective assistance, this Court must decide whether counsel's performance was within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To prevail on a claim that his counsel was ineffective, a defendant bears the burden of proving two elements. First, he must prove his counsel made errors so serious that he was not functioning as counsel as guaranteed by the Sixth Amendment. Strickland v. Washington, 466 U.S. 668, 687 (1984); Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). This element is proved by showing that counsel's representation fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688. Second, the defendant must prove that he was prejudiced by his counsel's unprofessional errors, such that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id. at 694; Butler v. State, 789 S.W.2d 898, 901 (Tenn. 1990). Defendant's failure to prove either element, deficient performance *or* prejudice, requires dismissal of his claim. See Strickland, 466 U.S. at 697.

When reviewing a defense attorney's actions, this Court may not use "20-20" hindsight to second-guess counsel's decisions regarding trial strategy and tactics. Hellard v. State, 629 S.W.2d

4, 9 (Tenn. 1982). Counsel's alleged errors should be judged at the time they were made in light of all the facts and circumstances. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746.

The record reveals that Defendant received assistance of counsel from three attorneys during his trial and, because this issue was raised in his motion for new trial, the trial court heard testimony from all of them at the hearing on his motion. Regarding Defendant's first issue, concerning the video tape, the attorney responsible for acquiring this particular evidence testified that she assigned the job to an investigator frequently used by the attorneys in their office. However, after the investigator videotaped the crime scene and viewed the video tape, he reported that the videotape showed much more lighting than they had anticipated. In other words, the level of darkness shown on videotape was not probative of conditions sufficiently poor to prove that an identification of Defendant would be difficult. Although the attorney admitted that she did not view the tape personally, she testified that she had no reason to doubt the investigator's judgment. The decision to forgo use of the tape was solely a matter of strategy.

Regarding Defendant's second issue, concerning the failure of trial counsel to individually voir dire the jurors, the record reflects that the trial court did not rule on a motion for individual voir dire because Defendant's counsel moved to strike the motion during a pre-trial hearing on October 30, 1998. Before moving to the next issue, however, the trial court assured counsel that if there was an issue which required separate questioning, the court would ask the other jurors to step out for the time necessary to resolve the issue. The record is silent regarding further discussion of this specific matter.

Defendant's last issue alleges that trial counsel was ineffective for failing to adequately cross-examine Hampton regarding inconsistencies in her testimony at trial. Defendant claims that because Hampton testified that she saw him at Vanderbilt, but later failed to mention her observation to the police, her veracity as a witness was highly suspect and this circumstance was crucial to his defense since she was one of two eyewitnesses. That may be so, but the record shows that counsel *did* question Hampton concerning this particular inconsistency. Specifically, during Defendant's cross-examination of Hampton, defense counsel pointed out that in the report of her conversation with Detective West, "there's no mention . . . of anything regarding anybody at Vanderbilt Hospital who you believed to be the individual involved in this case." Hampton replied that she thought she had told the detective about her observation of Defendant and, when counsel demanded an explanation for the omission, she responded that she had none. A few minutes later, Defendant's counsel asked her again whether she mentioned to the police that she had seen Defendant at Vanderbilt Hospital, and she replied, "No."

After a review of the facts and circumstances surrounding the legal representation of Defendant, we cannot find the performance of any of Defendant's attorneys was not within the range of competence demanded of counsel in criminal cases. See Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Defendant is required to show that counsels' representation fell below an objective standard of reasonableness, but he has failed. The attorney in charge of securing evidence of the darkened conditions surrounding the crime scene testified that she did so, but the evidence was not as probative as they had hoped it would be. Defendant's brief cited no proof in the record which

would indicate the videotape was not made or that it was probative of poor lighting conditions; he merely complains that he was not given an opportunity to view it. Counsel testified that Defendant never asked to see it. Defendant's next allegation concerning individual voir dire is similarly unsupported by proof; his argument concerning this issue consists of one paragraph which contains no citation to authority or references to the record. Since the record does not provide any information concerning the racial breakdown of the jury, or any other facts indicating possible bias or partiality, Defendant has failed to show any reason why individual voir dire would be warranted. Lastly, Defendant's argument regarding Hampton's inconsistencies fails for the reasons discussed supra. Thus, Defendant failed to prove that any attorney on his defense team made errors so serious that they were not functioning as counsel as guaranteed by the Sixth Amendment. Strickland v. Washington, 466 U.S. 668, 687 (1984); Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993).

We note that Defendant also failed to prove that he was prejudiced by his counsels' unprofessional errors, such that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694; Butler v. State, 789 S.W.2d 898, 900 (Tenn. 1990). In his brief, the portion of Defendant's argument claiming prejudice states only that the eyewitness identifications were pivotal pieces of evidence and the video tape was the key to discrediting them. As a matter of fact, the record reveals that the jury heard a number of statements by various witnesses attesting to the dark conditions that night. Indeed, the three persons with Hampton near the stairs testified that they were unable to identify Binkley's assailants due to poor lighting conditions. Hence, the fact that the night did not provide optimum conditions for identification was presented to the jury, and Defendant was not prejudiced by the absence of a videotape to affirm a fact already in evidence.

In sum, Defendant has failed to prove either element, deficient performance or prejudice, by clear and convincing evidence. See Strickland, 466 U.S. at 697. Defendant is not entitled to relief on this issue.

## CONCLUSION

Based upon the foregoing, we AFFIRM the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE